## Georgina Monast *vs.* Manhattan Life Insurance Co.

### MAY 25, 1911.

PRESENT: DUBOIS, C. J., JOHNSON, PARKHURST, AND SWEETLAND, JJ.

(1)  *Life Insurance.  Payment of Premiums by Third Party.*

A life insurance policy is not void because the premiums have been paid by someone not the assured or beneficiary or by one having no insurable interest in the life of the assured, whether or not he paid them in the belief that he was named as beneficiary or that he could collect upon it. The policy is notwithstanding binding upon the company which must pay it according to its terms on death of assured.

(2)  *Life Insurance.  Rescission.  Lapse.  Recovery of Premiums.*

Where payments were made on a life insurance policy by one who was the agent of the assured and also the agent of a third party (plaintiff) who claimed to have paid the premiums under the belief that she was named as beneficiary in the policy, such policy being a valid obligation of the company so long as the premiums were paid and having been allowed to lapse before

plaintiff made known to the company any claim of right thereunder, plaintiff had no right of rescission and no claim to recover any premiums paid by her.

(3)   *Life Insurance.   Insurance Broker.   Agency.*

An insurance broker is ordinarily one who is engaged in the business of procuring insurance for such persons as apply to him for that service.   He is usually the agent of the insured and though under special circumstances he may be the agent of the insurer the mere fact that he receives a commission from the insurer for placing the insurance with him does not change his character as agent of the insured, and where the regular agent of another company entered into an agreement with the sub-agents of defendant company to turn over surplus business to them for a share of their commissions he was acting purely in the capacity of a broker.

(4)   *Life Insurance.   Insurance Brokers.   Agency.*

The regular agent of an insurance company entered into an agreement with the sub-agents of defendant company, to turn over surplus business to them for a share of their commissions.   He was not known to the defendant or to their general agents and it did not appear that the sub-agents had any authority to employ agents.

*Held,* that he was not the agent of defendant in any sense except possibly to deliver policies entrusted to him by the sub-agents and collecting the first premiums thereon, and defendant was not responsible for his conduct in misrepresenting the contents of a policy, or in misstating the law as to insurable interest, to a person who as a result paid premiums on a policy issued to a third person in the belief that she was the beneficiary under such policy, and that such premiums so paid could not be recovered from the company.

(5)   *Life Insurance.   Claim to Proceeds of Policy.   Notice.*

Policies issued upon the life of assured on his own application, payable to his personal representatives, are valid contracts, entitling the administrator to payment on proof of loss, and the fact that a person who had paid the premiums under the belief that she was the beneficiary notified the general manager of the company after death of assured that she had paid the premiums and had held the policies and claimed to be entitled to some or all of the money, was no more than notice of her claim against the estate for reimbursement or claim to the proceeds of the policies at variance with their terms, and the company was justified in making payment to the beneficiary named in the policy.

(6)   *Life I. surance.   Rescission.   Laches.*

Where through the misrepresentation of an insurance broker plaintiff paid premiums on an insurance policy under the belief that she was the beneficiary, and had actual notice from the broker at least a year before death of assured that she was not named as beneficiary therein and further notice more than two months before death of assured to the same effect from other sources, by waiting until the death of assured and the absconding of the broker before making her claim to the company and by permitting the policy

to get into the hands of the person lawfully entitled to the same, even if plaintiff had at any time any rights in the policy, it was too late then for her to rescind or to maintain any claim against the company for the money paid by her for premiums.

(7) *Rescission. Laches.*

Rescission for fraud or mistake is a purely equitable right and must be exercised with great promptness after discovery of the truth and can only be exercised when the other party can be placed in *statu quo.* If while one delays after having knowledge of the facts the position of the other party has altered, the right to rescind is lost.

Assumpsit.   Heard on exceptions of defendant and sustained.

Parkhurst, J.   This is an action on the case in assumpsit for money had and received, brought for the purpose of recovering back certain premiums alleged to have been paid by the plaintiff to the defendant on two policies of life insurance on the life of Arthur J. Marchant, the plaintiff's nephew by marriage.   It was tried before a judge of the Superior Court for the counties of Providence and Bristol, sitting without a jury, on the twenty-ninth day of November, 1909, and the ninth and tenth days of March, 1910.   By a rescript filed a few days after the trial was finished, the judge decided that the plaintiff was entitled to recover of the defendant all the premiums which had been received by the defendant upon these policies, amounting in all to twelve hundred forty-one and $90/100$ dollars ($1,241.90).

To this decision and the conclusions of fact and law upon which it was based the defendant duly excepted, averring that it was against the evidence and contrary to law and that the damages were excessive; and a bill of exceptions covering the exceptions so taken, and a few exceptions taken in the course of the trial of the case, was duly allowed by the Superior Court, together with a transcript of all the evidence.   The questions before this court now are whether the decision is supported by the evidence and whether any of the rulings excepted to by the defendant constitute reversible error.

The principal facts of the case are as follows: The plaintiff in the fall of 1902 went to call on her sister-in-law,

Mary C. Marchant, mother of A. J. Marchant, the assured. There she met these two and also an insurance agent named Brophy, who was a duly appointed agent of the Metropolitan Life Insurance Company, having an office in the city of Providence. Mrs. Marchant began to talk about life insurance and said she wanted to have her son's life insured. The son said to the plaintiff, "If you have my life insured, I will have yours" and she said, "All right." She signed no application then or at any other time.

About a week or two after that interview Brophy came to her with two policies on the life of A. J. Marchant, which he told her were, one for Five Thousand Dollars ($5,-000) in the Manhattan Life Insurance Company and the other in the Metropolitan Life Insurance Company. He told her, as she says, that these policies were made payable to her. Plaintiff was not satisfied to take Brophy's word as to the beneficiary in the policies, and, being unable to read herself, she had a neice of hers read them and was told by her that she, the plaintiff, was named as beneficiary.

The plaintiff kept these policies and did not have them read to her again until about two months before the death of the assured, supposing, as she said, that they were payable to her. She says she paid the premiums every year for five years to Brophy, on the Manhattan Life Insurance policy, and took receipts from him, which must have been his personal receipts and not official receipts of the company. What amounts she paid or what Brophy did with the money was not shown, except as to the last payment, which was made by a check, payable to the Manhattan Life Insurance Company, which was for $201.90, the amount of the annual premium on a policy which was actually issued by that company on the life of A. J. Marchant, dated October 15, 1902, and made payable to his executors, administrators or assigns and actually paid to the administrator of his estate upon surrender of the policy and proof of his death in the spring of 1907. This check was shown to have been received and endorsed by E. A. Dunham, the New England manager for the defendant company; but it is not drawn by the plaintiff,

does not bear her name, nor the name of Brophy, and in itself cannot be regarded as giving to the defendant any notice of any connection between the plaintiff and the policy, or any interest of the plaintiff therein.

At least two months before the death of the insured, the plaintiff was told by two men, Mr. Herschcovitz and her nephew George Maynard, that two policies which they saw, presumably these policies, were not payable to her, the $5,000 Manhattan policy being payable to the estate of the assured and the Metropolitan policy (which was for $3000), being payable to Mrs. Marchant, his mother. They talked with Brophy about the matter, but did nothing else until after the death of the assured, who died of consumption. About two days after his death, Brophy came to her and persuaded her to let him take one of these policies, saying that he would get the money for her. "He did not say he would get it for Mrs. Marchant." At first she said this was the Manhattan policy, but afterwards she changed her testimony and said it was the Metropolitan policy. Instead of getting the money for her on this policy, Brophy assisted Mrs. Marchant in collecting the money on it from the Metropolitan Life Insurance Company, for which he was agent; Brophy got $500 for himself and then ran away out of the state and has not returned since, so far as shown. Several weeks after she let Brophy take this policy, George Marchant, brother of A. J. Marchant and administrator of his estate, though she does not admit that she knew it at the time, came to her and told her that Brophy had run away. He asked her then, according to her story, to let him take the Manhattan Life Policy for a few hours to compare it with a policy that he had and she gave it to him, though she admitted that she knew at the time that it was payable to the executor or administrator of the deceased. When the administrator did not bring the policy back, she consulted attorneys and then went with her friend, Mr. Herschcovitz, and her nephew, George Maynard, to the office of Isaac L. Goff, where they met Mr. Dunham, New

England manager for the defendant company. There she told Mr. Dunham that the policies belonged to her and said nothing else. The others told him that she had thought she was beneficiary in the policy and had paid the premiums on it. They had other interviews with Mr. Dunham, but seem to have given him no further information. He said that he would see the Marchants and try to fix things up between them.

Mr. Carroll, her attorney, also testified that he told Mr. Dunham that in his opinion the whole business was a fraud on the plaintiff and that he was thinking of filing a bill in equity to restrain the company from paying the money until the matter could be investigated, and that Mr. Dunham said he would not pay the check until everything was understood. Mr. Dunham denied any such promise, but said that he agreed to see the Marchants and try to arrange the matter with them, but did not succeed. In rebuttal Mr. Carroll said that he told Mr. Dunham that the plaintiff had been beaten out of the money and that they were going to try to make them (evidently meaning the Marchants) put it back again, if they could get it, and that Mr. Dunham said he would see the Marchants and try to settle it up, if Mr. Carroll would only keep quiet and wait.

In all the interviews only the one policy seems to have been mentioned and there was no rescission or attempt at rescission of that and no demand for a return of the premiums from the company. Moreover, nothing seems to have been said about any false representations by Brophy, who apparently was not mentioned at all. All that seems to have been asked of Mr. Dunham was that he hold back payment of the amount of the policy from the administrator of the estate of the assured and try to get him to let the plaintiff have part of the money because she had paid the premiums. The plaintiff and her attorney seem to have been quite willing that Mr. Dunham should pay the company's money to the administrator, if a part of it was paid by the latter to her.

Under these circumstances, Mr. Dunham, being unable

to arrange a satisfactory settlement with the Marchants, paid over the check for the policy to the administrator. It was immediately cashed by the administrator and the paid check, with the policy attached, went back to the company. Later the present suit was brought, evidently for a return of the premiums paid on this policy alone, as the damages laid were only One Thousand Dollars ($1,000); and it appears to have been only as an afterthought that premiums alleged to have been paid to the defendant on a later policy were asked for also.

This later policy was for $3,500 dated October 28, 1902, and also payable to the executors, administrators or assigns of Arthur J. Marchant, but there was no satisfactory evidence that the plaintiff ever paid any premiums upon it to Brophy or ever had possession of it; and if she did, there was nothing to show how or when she got it. She testified that she paid the premiums on it for five years to Brophy, but it appeared later that this testimony was entirely unreliable. She said Brophy told her it was payable to her, but when he told her this does not appear, nor did she say that she was induced to take it and pay any premiums on it by any such statement on his part or that he had anything to do with her having the policy, if she ever had it.

At any rate, whoever had the policy at first, only two premiums were ever paid on it to the company and it lapsed in consequence and was surrendered to the company. By whom the two premiums were actually paid to the company was not shown, but they were received as the money of the assured and applied to his credit by the company, who knew nothing about the plaintiff or about anyone having or claiming any interest in either of the policies until after the death of the assured.

These two policies were produced by the defendant at the request of the plaintiff's counsel, who had described them in the bill of particulars and then for the first time claimed that the plaintiff had paid the premiums on both of them. They were issued by the defendant under the

following circumstances: Isaac L. Goff was sub-agent of
Mr. Dunham for Rhode Island, with authority only to
procure applications for insurance, send them through Dun-
ham to the defendant company, and if policies were issued
on them, to deliver the policies to the applicants and collect.
the first premiums, and his appointment as such was recog-
nized by the company.

About the time these policies were issued, but whether
before or after the first meeting of the plaintiff and Brophy
does not appear, the latter, who was, as already stated,
a resident agent for the Metropolitan Life Insurance Com-
pany and had no license from the State of Rhode Island to
solicit insurance in any other company and had no connection
whatever with Isaac L. Goff or the Isaac L. Goff Company,
came to William D. Goff, who had charge of the life, accident
and liability insurance department of that company and
asked if Mr. Goff would allow him a commission for any
business he might send him. Mr. Goff said he would and a
short time afterwards Brophy brought in some business.
He had the applications made out for policies on the life
of A. J. Marchant and the party was examined and the poli-
cies were delivered and paid for. Brophy was not agent
or solicitor for the defendant company and had no con-
nection with the Goffs, except that during a period of about,
four years, he brought in some applications, not very many,.
on which he was entitled to commissions under the arrange-
ment just mentioned. When the policies for which Brophy
had brought in the applications came back from the company,
they would be given to him and he would pay for them..
Neither the home office of the company nor Mr. Dunham
knew anything about Brophy or ever heard of him until
after the death of A. J. Marchant. It does not appear that
Isaac L. Goff had any authority to appoint sub-agents or
solicitors to act for the defendant, and in fact no such sub-
agents or solicitors were appointed. It is important in
this connection to notice also that the plaintiff never stated

that Brophy claimed to represent the defendant or that she dealt with him as its agent.

During the lives of these policies, whenever a premium was about to fall due, a notice of that fact was sent from the home office by mail, postage prepaid, addressed to the assured at his residence and also a similar notice from the Boston office. None of these notices from the home office was returned undelivered. From the above facts it is clear not only that the assured applied for these policies and was examined for them, but also that he must have known that they had been issued and that the premiums were being paid on them, whether or not he actually received them himself or paid any premium upon them.

Inasmuch as our disposition of this case depends upon certain fundamental questions, rather than upon a consideration of the specific exceptions, it will not be necessary to state the exceptions in detail; and we therefore find it convenient only to state the general questions, upon the decision of which we have come to our conclusions in this opinion: and we state the same as follows, as we find them set forth in the defendant's brief:

1. Was there satisfactory proof that five premiums on the first policy and two on the second were paid to the defendant with money of the plaintiff, especially as to the second policy?

II. Granting that there was such proof, did the plaintiff have the right to rescind the second policy, which lapsed for nonpayment of the third premium and recover back the first two premiums?

III. Was the defendant company bound by the false representation by Brophy on which the plaintiff relies?

IV. Were the policies valid and binding contracts between the company and the assured, or was the company ever legally under a risk by reason of them, so that it gave consideration for the premiums received by it upon them?

V. If the plaintiff had any right to rescind, did she exercise that right promptly enough and in a proper manner, or was she guilty of laches which should bar her recovery?

566    Monast v. Manhattan Life Insurance Co.    [32

The decision of the court below, finding for the plaintiff, in the full amount claimed by her, is based primarily upon the determination, that Brophy, under all the facts above set forth, was so far the agent of the defendant, that it was bound by his fraudulent representations to the plaintiff that the policies delivered to her, while written upon the life of A. J. Marchant, were written for her benefit and named her as beneficiary; that the policies were voidable or enforceable by the plaintiff at her option, since the defendant company could not have avoided the policies on the ground of its own fraud; so that the plaintiff could choose whether she would enforce the policies, or rescind them; that she, by her notice to Dunham, the general agent or manager of the defendant, prior to the payment of the $5,000 policy to the administrator, elected to rescind the contracts and to demand repayment of the premiums, and thereby became entitled to sue for and recover the same in this suit; and that she was not guilty of such laches in the rescission, as to bar her right of recovery.

We are constrained to differ with the court below with regard to all of the above findings, and we are of the opinion that the same are fundamentally erroneous.

With regard to the first question above set forth, the defendant earnestly contends that there was no satisfactory proof that more than one payment made by the plaintiff to Brophy on the first policy was received by the defendant and as to the second policy there was no proof that she ever paid any premiums on it to anybody. Inasmuch as we deem it to be immaterial, in the view we take herein regarding the relations and obligations of the parties, whether the plaintiff actually paid any or all of the premiums on these policies, we will not waste time or space in considering this question, further than to say that the testimony is most unsatisfactory in that it fails to trace clearly into the hands of the defendant, through Brophy, any of the moneys of the plaintiff claimed to have been paid as premiums on these policies, except the proceeds of a certain check dated October 18,

1906, drawn to the order of the defendant, on the Industrial Trust Company, Pawtucket Branch, by Lucien Heroux, for the sum of $201.90, the proceeds of which are admitted to have been received by the defendant. As the amount of this check exactly corresponds with the last premium paid on the $5,000 policy, it would seem from the evidence that this was a check procured from a friend by the plaintiff to pay the last premium due prior to the death of the insured. Our only purpose in calling attention to this check is to show, that even as to this payment, there is nothing to give notice to the defendant that it was made by or on behalf of the plaintiff, or that the plaintiff or Brophy had anything to do with it or had any interest in the policy upon which the payment was made. It does not appear that as to this or any other payment the plaintiff ever received any official receipts of the company, or that any payment of premiums was ever made in any such way as to notify the defendant of any interest claimed by the plaintiff in either of the policies, or that Brophy was acting or attempting to act as the defendant's agent. But, for reasons which will appear hereafter, we deem it to be immaterial whether any or all of these premiums were paid by the plaintiff, so long as the defendant was not thereby affected with notice of any claim of the plaintiff to an interest in the policies, or with notice of Brophy's connection therewith so as to make Brophy the defendant's agent.

(1)   We deem it to be clear both upon principle and authority that a life insurance policy is not void because the premiums have been paid by some one not the assured or beneficiary or by one having no insurable interest in the life of the assured, whether or not he paid them in the belief that he was named as beneficiary or that he could collect upon it. The policy is, notwithstanding, binding upon the insurance company, which must pay it according to its terms on the death of the assured. *Knights and Ladies of Honor* v. *Burke*, 15 S. W. (Tex.) 45; *Brennan, Admr.* v. *Prudential Ins. Co.*, 148 Pa. St. 199; *Prudential Ins. Co.* v. *Cummins, Admr.*, 44 S. W. R. 431, 25 Cyc. 751.

In *Knights & Ladies of Honor* v. *Burke, supra,* the court says: "One Pinson was a member of the order of the Knights & Ladies of Honor and held two benefit certificates thereon, aggregating $3,000. Appellee, Burke, was the beneficiary in said certificate. Burke has no insurable interest in the life of Pinson. . B. paid dues and assessments for P. to the amount of $189.20. Appellant had no notice that B. and not P. paid said dues and assessments. B. ceased to pay dues and assessments for P. and while P. still lived, brought this suit to recover of appellant the said sum of $189.20 paid out as aforesaid. He recovered judgment for said amount in both the justice's and county court. We are of the opinion that the judgment is wrong. Appellee could not be beneficiary in the certificates and could not legally claim or recover the insurance upon the death of B. Having no insurable interest in the life of P., public policy would not permit him to be recognized as a beneficiary in said certificates. . . . His payment of the dues and assessments for P. was an arrangement between P. and himself with which appellant had nothing to do. There was no privity of contract between him and appellant. Appellant was entitled to the amount paid from P. and not from B., but if B. saw proper to pay the same for P., he must look to P. and not to appellant for reimbursement. The certificates are not void, except as to B., but upon P's death, would be payable to his heirs."

In *Brennan, Admr.* v. *Prudential Ins. Co., supra,* such a defense was held not available to the company, when sued by the administrator of the assured upon a policy made payable to his personal representative, although the policy had been delivered to one having no insurable interest who paid all the premiums upon it.

In *Prudential Ins. Co.* v. *Cummins, supra,* the decision is the same, and the court says: "It appears that Mary Malley paid the premiums upon the policy in the belief that Cummins' life was insured for her benefit and that at his death the sum which the policy obligated the company

to pay would be paid to her.  She did not sign the application for the insurance. . . .  Had the policy been payable to Mary Malley, the question would arise as to whether she had an insurable interest in the life of Cummins; but as the policy was made payable to Cummins' personal representative, it must be treated as a contract with Cummins.  The mere fact that she paid the premiums on the policy did not render invalid the contract of insurance."

(2)  As we shall show hereafter that Brophy was not the agent of the defendant, but was the agent of the assured and also the agent of the plaintiff in making such payments as were made, if any, to the defendant, it follows that the later policy for $3,500 being a valid obligation of the company so long as the premiums were paid, and having been allowed to lapse long before the plaintiff made known to the defendant any claim of right thereunder, by reason of the failure of Brophy to pay the premiums thereon, the plaintiff had no right of rescission as to that policy, and therefore no claims to recover any premiums by her paid thereon.

(3)  As to the third question suggested by the defendant, whether it was bound by Brophy's false representations to the plaintiff, we are quite satisfied upon all the evidence that the defendant company was not bound by Brophy's false representations as Brophy was a mere broker, except so far as he was agent for the plaintiff or the assured, and had no authority from the company, express or implied, to make such representations.

That Brophy was a mere broker and not the agent of the defendant company except possibly for the sole purpose of receiving payment of the first premium is clear from the following authorities:  *Wilson* v. *Conway Fire Ins. Co.,* 4 R. I. 141; *Reed* v. *Equitable &c. Ins. Co.,* 17 R. I. 785; *O'Rourke* v. *John Hancock, &c. Ins. Co.,* 23 R. I. 457; *Kings Co. Fire Ins. Co.* v. *Swigert,* 11 Bradw. (Ill.) 590 at 599; *Am. Fire Ins. Co.* v. *Brooks,* 83 Md. 22; *Hartford Fire Ins. Co.* v. *Reynolds,* 36 Mich. 502; *Gude* v. *Exchange Fire Ins. Co.,* 53 Minn. 220; *Bradley* v. *German Am. Ins. Co.,* 90

Mo. App. 369; *Mellen* v. *Hamilton Fire Ins. Co.*, 17 N. Y. 609; *How* v. *Union &c. Life Ins. Co.*, 80 N. Y. 32; *Devens* v. *Mechanics &c. Ins. Co.*, 83 N. Y. 168 at 171; *Pottsville &c. Ins. Co.* v. *Minnequa &c. Co.*, 100 Pa. St. 137; I Cooley's Briefs on Insurance, 68; 1 May on Insurance (4th ed.) § 124.

While the Rhode Island cases cited above do not in their facts so nearly correspond to the case at bar as to necessitate a review of the same, they clearly show that this court has always strictly construed the powers of a solicitor of insurance, or insurance broker, and has clearly defined the distinction between such a solicitor, or broker, as the agent of the assured, and a duly authorized and recognized agent of the insurance company; and that this court is fully in accord with the principles laid down in the other cases above cited.

In *Kings Co. Fire Ins. Co.* v. *Swigert, supra*, it is held that one who solicits insurance of the assured and afterwards procures a policy to be issued by the insurer is not an agent of the latter nor does the fact that the insurer placed its policy in the hands of the broker for delivery make him an agent or give rise to a presumption of agency except where there have been no previous dealings between the broker and the assured. If, in fact, before the policy is issued the assured has had dealings with the broker as by giving him an application to place, or the latter is in any way clothed by the assured with the credentials of agency, the insurer may treat him as the agent of the assured.

In *Am. Fire Ins. Co.* v. *Brooks, supra*, it is held that a broker who is employed to obtain a policy of insurance is the agent of the assured and not of the insurer, although he asks the assured to take out the policy, but his agency is not continuing and ceases upon the delivery of the policy.

In *Gude* v. *Exchange Fire Ins. Co., supra*, suit was brought on a fire insurance policy and defended by the company on the ground that a mortgage on the insured property was not disclosed when the policy was taken out. It was pro-

cured through one Case who knew of the mortgage, but the court held that he was a mere insurance broker and that his knowledge was not the knowledge of the company. He came to the plaintiffs and solicited the insurance, saying that he represented several companies, including the defendant. His name did not appear on the policy and there was no showing that the defendant company ever knew of his existence. He had procured the insurance through its regular agents. The court says: "Giving to the evidence the construction most favorable to the plaintiffs, and assuming that he personally presented to the defendant an application for this insurance and received the policy directly from and paid the premium directly to the defendant, it does not appear that he had any relations whatever with the defendant other than an insurance broker, who, in his own behalf, solicits insurance, submits applications to the company, and, if accepted, receives the policy for the insured, and on its delivery collects the premium and pays it over to the company. Such a broker might be deemed the agent of the company for the purposes of delivering the policy and collecting the premiums, but nothing more. . . . We think the circumstances were wholly wanting from which the jury might have been warranted in finding the fact of agency."

In *Mellen* v. *Hamilton Fire Ins. Co.*, *supra*, it is held that the knowledge of a broker who effected the two insurances under no employment by the insurers but for a commission paid by them upon the premiums received for such risks as he procured to be effected and as they chose to accept, that subsequent insurance was being procured upon the same property does not charge the prior insurers with notice of such subsequent insurance. He is not the agent of that company for that purpose. The court said (p. 616): "The allegation that Kane was the general agent of the defendants, to whom a notice, binding on the company, of a subsequent insurance, could properly be given, is not only not sustained, but in our opinion, is plainly contradicted by the

evidence.   He was an insurance broker; and from the nature of his business, as such, was no more the general agent of the defendants than of any other company or individual to whom his professional services had been rendered.   In procuring the insurance he was the agent of the assured, and if, before the transaction was complete, he became for any purpose the agent of the defendants, that agency wholly ceased when he had delivered the policy to the assured and had paid over to the company the premium which he had received."

In *How* v. *Union Mutual Life Ins. Co.*, *supra*, an action was brought on a policy of life insurance on the life of one Marcus obtained of the defendant through James A. Rhodes. The defense was that the policy had lapsed for non-payment of two premium notes at maturity.   The plaintiff claimed that Marcus had given Rhodes his negotiable note for $640, with collaterals, out of which Rhodes was to provide for the payment of the premium notes.   It is held that the note for $640 did not operate as a payment of the premium note, and the court says (p. 38):   "Rhodes was in no sense the agent of the defendant to take that note.   He was the agent in the city of New York in 1872 of several life insurance companies, but not of the defendant.   Judd & Blauvelt were its general agents in that city.   Rhodes was largely engaged in life insurance, and when he had a larger amount of proposed insurance upon any life than he could place in the companies of which he was the agent, he would seek other companies for the surplus; and one of the companies to which he resorted occasionally for such purpose was the defendant, and in that way he procured from this defendant as many as fifteen policies.   He had no transactions or correspondence of any kind directly with the defendant at its general office in Boston, but his transactions were with Judd & Blauvelt.   When he desired a policy from the defendant he would apply to Judd & Blauvelt and take the application to them and procure from them a policy and receipts for the premium and deliver the policy to the

assured and receive the premium and account with Judd & Blauvelt for it, deducting such commissions, as they allowed him;" . . . "As to the defendant, his relation was substantially that of an insurance broker. He was not in any proper sense its agent."

In the above citation from Cooley's Briefs on Insurance, the law is clearly laid down, as follows, p. 68:

"An insurance broker is ordinarily one who is engaged in the business of procuring insurance for such persons as apply to him for that service. He is, therefore, usually the agent of the insured, and will be so considered, though a statute may declare that whoever in any manner aids or assists in making a contract of insurance on behalf of any insurance corporation or property owner shall be held to be an agent of the corporation for all intents and purposes.

"Though under special circumstances a broker may be the agent of the insurer . . . the mere fact that he receives a commission from the insurer for placing the insurance with him does not change his character as agent of the assured.

"A stipulation in the policy that any broker employed in effecting the insurance should be considered as the agent of the insured is no more than a declaration of the common rule."

These cases show and it is well understood by the public generally and recognized by our insurance legislation in this state, that there are insurance brokers who are paid for their work by a share in the commissions of insurance agents with whom they place business, and that this does not make them the agents of the insurers. The applications secured by them are of value to an agent, if accepted by his company, and are paid for accordingly, like so much merchandise. That there is a general arrangement as to what rate of compensation, by way of a share of the agent's commission, shall be paid cannot change an insurance broker into an agent for any particular company. No company can control his movements or be held responsible for his conduct.

(4)  In the present case Brophy was not in the employment of the defendant, which had no control over him.  He was not its agent in any sense, except possibly for the purpose of delivering policies entrusted to him by its agents to the persons who had applied for them and collecting the first premiums.  He was not known to the company or its general agents at all, and there was nothing to show that Isaac L. Goff or anyone in his office had any right to employ sub-agents for the company.

Brophy was a regular agent for the Metropolitan Life Insurance Company, and in turning over surplus business to the soliciting agents of the defendant company, he was acting purely in the capacity of a broker.  He was not held out as its agent, and there is nothing to indicate that the plaintiff regarded·him as such.  He certainly had no actual authority to misread one of its policies to anybody, and no such authority can be implied.  The plaintiff never applied for a policy in the defendant company, no policy was ever issued to her, and Brophy had no authority from the defendant or its agents to deliver any policy to her, to make any statement as to its contents to her or to collect any premium from her.  There was no privity between the plaintiff and the defendant, and if Brophy misread the policy to her and misrepresented the law to her as to insurable interest, it was not within the scope of any employment of him by the defendant company, and that company was not responsible for his fraudulent conduct.  He was clearly under the above authorities, acting either as the agent of the assured, or in fraud of the assured, in delivering the policies to the plaintiff, and as the agent of the plaintiff in collecting and transmitting any of her moneys.

We are clearly of the opinion that the conclusion reached by the Superior Court to the effect that Brophy was the defendant's agent, and that the defendant was responsible for Brophy's fraudulent misrepresentations to the plaintiff, whereby the plaintiff was induced to pay the premiums, or any of them, upon these policies of insurance, was entirely

unwarranted by the evidence, and that therefore the decision, which rests entirely upon that conclusion, must be set aside.

(5)   We are of the opinion that it necessarily follows from the foregoing that the policies, issued as they were upon the life of the assured upon his own application, payable to his personal representatives after his death, were valid contracts of insurance, at the outset, and remained such, as to the earlier policy for $5,000, until the death of the assured and payment to his administrator; and as to the second policy for $3,500, until the same was allowed to lapse for nonpayment of premiums.   We find nothing to show that, so far as this defendant was concerned, anything was done whereby its obligation to pay the $5,000 policy ceased, or whereby it would have been justified in either refusing or delaying payment thereof, upon its presentation by the administrator with duly authenticated proofs of loss in accordance with its rules.   Whatever was done with regard to any agreement with the plaintiff, as to her holding the policies and being entitled to any interest thereunder, was done between the assured, Brophy and herself entirely without any knowledge on the part of the defendant, or any fact or circumstance brought to its knowledge of which it was bound to take notice.   The mere fact that the plaintiff notified the defendant's general manager, Mr. Dunham, after the death of the assured and just prior to the payment of the insurance that she had paid the premiums and had held the policies and claimed that she was entitled to some of the money or all of it, was nothing more than notice to him that she had some claim against the estate of the deceased for reimbursement of moneys paid out by her; or some claim to the proceeds of the policy which was totally at variance with the terms of the policy.   He, having, as he agreed, endeavored to induce the Marchants to settle with her to her satisfaction, for such claims as she made, and having failed to do so, was fully justified in paying over the money, in accordance with the terms of the policy, to the

lawful claimant thereof (the administrator), and in leaving her to make such demand and claim upon the estate of the deceased as her counsel might advise. Neither Mr. Dunham, as agent for the defendant, nor the defendant, were bound to enter into and investigate or take notice of any of her claims as to the fraudulent conduct of Brophy, who was her own agent and who was primarily responsible to her if he had defrauded her.

(6)  Furthermore, if the plaintiff had, at any time, any such right or interest in the insurance as would have enabled her to surrender the policy when she had possession thereof, she had actual notice from Brophy himself at least a year before the death of the assured, that the policy did not name her as beneficiary; and further notice more than two months before the death of the deceased, from two friends who read the policy, to the same effect. She should have acted immediately upon such information, and have laid the matters frankly before the company, if she desired any action to be taken by the defendant. By waiting until after the death of the assured, and the absconding of Brophy, she deprived the defendant of the opportunity to investigate her claim through the only two persons (except herself) who had any knowledge of the transactions. So that, even if she had, at any time, any such right to the possession of the policy or any such interest therein, as would have enabled her to surrender or rescind the same (which it does not appear that she had from any evidence before the court) having allowed the policy to get into the hands of the administrator, who was by the terms thereof lawfully entitled to the same and to the proceeds thereof, it was then too late for her to rescind or to maintain any claim against the defendant for the moneys paid out by her as premiums.

(7)  Rescission for fraud or mistake is a purely equitable right and it is well settled that it must be exercised with great promptness after discovery of the truth and that it can only be exercised when the other party can be placed

in *statu quo*. If, while one delays after having knowledge of the facts, the position of the other party has altered as by the death of some person concerned in the matter or by loss of evidence, the right to rescind is lost. *Plympton* v. *Dunn*, 148 Mass. 523; *American Ins. Co* v. *Neiberger*, 74 Mo. 167; *Zallee* v. *Conn. Mut. Life Ins. Co.*, 12 Mo. App. 111; *Steinberg* v. *Phœnix Ins. Co.*, 49 Mo. App. 255; *Roddey* v. *Talbot*, 115 N. C. 287; *Fennell* v. *Zimmerman*, 96 Va. 197, and Mechem on Agency, edition of 1889, sec. 744.

We have carefully considered the elaborate briefs and arguments, as also the vast number of cases cited by the counsel for plaintiff, in support of their contention that the decision of the Superior Court should be sustained. We find no case cited which in any way leads us to doubt our conclusions above expressed. Most of the cases cited, which touch upon the question of fraud on the part of an agent which is to be imputed to the principal, are cases where the person actually guilty of fraud was beyond question an agent duly appointed and recognized as such by the principal. No case is cited, where the facts are at all similar to those in the case at bar, where a person acting in the capacity of an insurance broker, as Brophy was in this case, has been held to be other than an agent for the assured, or whose fraud has been imputed to the insurer.

Upon the whole case, we are of the opinion that the decision of the Superior Court must be reversed.

The plaintiff may show cause, if she see fit, why judgment should not be ordered to be entered for the defendant, on Monday, June 5, 1911, at ten o'clock in the forenoon.

*Hugh J. Carroll, Waterman, Curran & Hunt,* for plaintiff.

*Gardner, Pirce & Thornley* for defendant. *William W. Moss,* of counsel.