167 So. 723

## COMMONWEALTH LIFE INS. CO. v. BRANDON.

### 6 Div. 913.

Supreme Court of Alabama.

March 19, 1936.

Rehearing Denied April 23, 1936.

Huey, Welch & Stone, of Bessemer, for appellant.

266

Moore & Green, of Bessemer, for appellee.

THOMAS, Justice.

The suit was on a policy of life insurance.

■ Demurrer to the complaint was overruled. The complaint was in Code form (Code, § 9531, form 12), and was not subject to demurrer. American Bankers' Ins. Co. v. Dean, 227 Ala. 387, 150 So. 333; National Life & Accident Ins. Co. v. Puckett, 217 Ala. 110, 115 So. 12; Sovereign Camp, W. O. W., v. Hubbard, 217 Ala. 431, 116 So. 163; National Life & Accident Ins. Co. v. Bridgeforth, 220 Ala. 314, 124 So. 886.

The law of the other features of this case was declared on first appeal. Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755. We adhere thereto.

■. The real question for decision is the right vel non of the defendant to the general affirmative instruction requested.

Pleas 1 and 2 were the general issue; plea 3 and others of like tenor are based on provisions of the policy, plea 3 reading as follows:

"3. The defendant for further plea and answer says that the plaintiff ought not to have and recover thereunder, for that by the terms of the policy herein sued on it is provided:

"'No obligation is assumed under this policy prior to its date and delivery, nor, unless on said date of delivery the insured is alive and in sound health; nor if the insured has ever been rejected by this or any other company, nor if there is already in force in this company any previous policy unless the existence of such previous insurance is noted hereon by an endorsement signed by the Secretary or Assistant Secretary.'

"And the defendant further avers that said quoted provision was breached in that the insured was not in sound health on the date of the delivery of said policy herein sued on, for on said date the said insured was suffering from a serious disease or illness, to-wit: Sarcoma, which said disease increased the risk of loss and the defendant hereby tenders the plaintiff the sum of $23.40, which said sum is the amount of premiums paid on said policy."

We made observation of this pleading on the first appeal, where the questions of fact presented were: (1) Whether the misrepresentations made to defendant were false; (2) if so, whether they were of material facts that increased the risk that affected, or calculated to affect, the conduct of defendant in the issue and delivery of the policy; or (3) whether by reason of the agreement of the parties the policy did not become effective by its delivery, under the terms we have set out above.

We have declared that such a condition precedent is in fact a warranty, and that it affected the coverage of the policy. Reliance Life Ins. Co. v. Sneed, 217 Ala. 669, 117 So. 307; Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755.

The assured made application for the policy of insurance declared upon on March 13, 1930, which application contained the following questions, answers, and declaration:

"16. When last sick July 10, 1929.

"17. Of what disease? Right leg amputated

"18. Name and address of Physician who last attended life proposed Dr. W. S. Roberts

"19. Has person now or ever had (If so give particulars) Asthma, Bronchitis, Disease of the Lungs, Consumption, Cancer, Spitting of Blood, Fits or Convulsions, Chronic Diarrhea, Disease of the Kidneys, Disease of the Liver, Disease of the Heart, Paralysis, Dropsy, Rupture, Dysentery, Rheumatism, Ulcers, Scrofula, Open Sores, Varicose Veins. No."

"The undersigned hereby declares and warrants that the representations and answers made above are strictly correct and wholly true; that they shall form the basis and become part of the Contract of Insurance (if one be issued); that any untrue answers will render the Policy null and void, and that said Contract shall not 'be binding upon the Company unless upon its date and delivery the insured be alive *and in sound health.*" (Italics supplied.)

In November or December of 1928, the insured and plaintiff visited Dr. Ragsdale for examination of a growth on the leg of assured that was later amputated; an X-ray was made thereof; and on the advice of Ragsdale the insured then went to Dr. Roberts, who advised an operation to obtain a specimen of the tumor on that leg, the operation being performed in February, 1929, by Dr. Roberts. That operation consisted in making an incision on the outer side, exposing the tumor growing on the small or outer bone, and at that point about four inches of the bone were removed for further examination. Dr. Roberts was of the opinion that the insured had sarcoma, in that the tumor contained soft spots, which were evidence to him of a malignant tumor.

The specimen so removed was examined by Dr. Graham, a pathologist at the hospital, and as such pathologist Dr. Graham stated, after making a microscopic examination of the infected bone, that insured had sarcoma, thus confirming the diagnosis of Dr. Roberts. The latter was of the opinion that a recurrence thereof would appear in the leg or other parts of the body, testifying in this connection as follows: "After the first operation and after I had obtained this specimen I advised Mr. Harmon that it would probably be necessary for him to have a second operation, and probably not. I told him that it would probably be necessary, * * * and after the first operation, and determined exactly what it was, the question of whether the second operation would become necessary came up, and at Mr. Harmon's suggestion, I accepted $75.00 at that time, sometime close around the first operation, I don't remember the

date, whether he was still in the hospital or after; but sometime close to the first operation."

The second operation in July, 1929, showed an advanced state or growth of the tumor and no chance of recovery from this condition. Dr. Roberts stated: "After I saw him on the second operation in my opinion, I didn't think he would ever get well of that condition. The second operation was made merely to give him relief from the pain he was suffering from this malignant condition, for relief of pain. The second operation consisted of the amputation of the leg. The amputation was made just below the knee, about three and a half or four inches below the knee of the big bone, the entire small bone was taken out. The tumor in each instance was on the little bone; it had spread at the time of the second operation and it covered the whole leg."

On further examination of the witness (Dr. Roberts) the record recites:

" 'State whether or not you have ever known of a person to get well of fibrosarcoma.'

"The plaintiff objected to said question on the ground that it is a repetition.

"The court sustained the objection.

"If a person had sarcoma in February 1929, and was operated on at the time in February, and was later on operated on in July of 1929 for the same sarcoma and the same tumor, and later, in July 1931, died of sarcoma of the lungs, in my opinion that would be the sarcoma or a metastasis from the sarcoma that the person had in February, 1921. I think the disease would have been with him from February 1929, up until the time he died in July 1931. There is no way to arrive at how malignant any cancer is or any sarcoma. I would say that the sarcoma we are dealing with here is just as malignant and just as bad as cancer of the liver, something you can't get at to treat, although cancer of the liver is curable in lots of cases."

Dr. Graham was qualified and testified as a pathologist, as follows: "I was the pathologist in the Birmingham Baptist Hospital in February 1929 and in July 1929. A tumor from the right fibula bone that had been taken from Mr. Harmon was referred to me for examination in February of that year. The tumor—I saw a tumor in the laboratory at the West End Hospital or Baptist Hospital shortly after it had been removed. Dr. Roberts had operated on the patient and had removed a piece of the fibula, that is, the bone on the outside of the leg. The piece of bone was 8.8 centimeters long; that is pretty nearly four inches long, involving that bone and right around that bone, and partly invading it—at any rate, indenting it, there was a tumormass $6\frac{1}{2}$ centimeters of 5 by 3; that is, between $2\frac{1}{2}$ and 3 inches long in its longest direction, and about two inches wide one way, and a little shorter back the other way. Dr. Roberts had described the tumor as being as big as a lemon. Well, that possibly is a fairly good idea of the size. The tumor was inspected. I have a long description of it here that would be unintelligible but to a physician. And then pieces of it were taken, and thin sections of them were made and studied under a microscope, and the diagnosis was rendered a fibrosarcoma."

On cross-examination Dr. Roberts was asked and answered, as follows:

"Now, Dr. Roberts, immediately after Harmon was operated on, on the day of the operation and shortly after he was removed from the operating room on the day of the operation, in the presence of Mrs. Harmon here, there at the Birmingham Hospital, in Birmingham, if you didn't tell George Harmon, and make this statement to him, in her presence, in substance to this effect: I feel like I have had a successful operation, as this growth shelled out like a nut; I feel like you have no need to worry about his recovery, if it had been soft and jelly like you might have had cause to worry."

"I don't recall any such conversation. * * * I do not say that I did not have some conversation to that effect with them there at that time, I am sure that I did. As I remember it myself, I did tell them, I don't know how soon after, whether the same day or the next day, that this tumor was removed with the bone, that by removing the bone I got the whole roots of it."

Plaintiff's witness confirmed such conversation.

The first appeal treated the testimony of Dr. Graham as a mere *expression of an opinion* by an expert. In this record the statements of that witness are urged in argument to be *declarations of ascertained scientific facts*. When the whole evidence is looked to, these statements are the *expression of an opinion by a scientist,* the result of his microscopic examinations. That they were not more than an opinion of

an expert is demonstrated by that witness when he further testified as follows:

Question: "Now, the diagnosis that you make there, and the finding that you made, is that an opinion reached, or is that a finding of fact by the use of the facilities that you had had?"

The witness answered: "The point of the question is the diagnosis of that really a matter of opinion. Well, of course any conclusion that we draw *is really a matter of opinion; but the opinion is based on perfectly demonstrable facts. I mean that the opinion could be submitted to any pathologist in the country, and I am perfectly satisfied that any one of them would have reached the same conclusion from that section.* The point is, that in this particular case the picture seen under the microscope was so absolutely typical, that a trained pathologist would say fibrosarcoma. * * In other words, I could see what was there, and when I saw that type of cell there, that is fibrosarcoma. Naturally, the examination that I made requires that the person who makes the same be trained in that particular line of work. A layman could not make an examination of that kind. Most of the ordinary practicing physicians could not make an examination of that kind. There are some men who have had pathological training sufficiently so that they would recognize it. *I can state to the jury as a fact that I found as a fact from the examination I made that the tumor was fibrosarcoma.* I am certain as nearly as humanly possible that it is a fact." (Italics supplied.)

The record before us is sought to be differentiated, in this respect, from the testimony of that expert given on former trial. However, that witness' testimony, here given, was not more than an opinion about which scientists of his class may disagree. This is illustrated by other evidence in the record of physicians, who disagreed as to the character and malignancy of the several tumors indicated and the different classifications to which tumors may be assigned; whether this tumor was "sarcoma" or "fibrosarcoma," and whether or not both were "cancer." On these facts there were differences of opinion, as shown in evidence.

Dr. Graham further testified as follows: "I made a microscopic examination of the specimen that was removed by Dr. Roberts, or his leg that was removed in July of that year. I got the specimen; it was the right leg below the knee that had been removed by taking out all this little outside bone and part of the bigger bone—most of the bigger bone, except just as here (indicating). And the tumor was present in that specimen, and was bigger than it had been in February. The exact measurements of the tumor at that time are not given, but the tumor filled the space between the outside bone, the little fibula, and the tibia; all this space in here (indicating). And also extended up along the shaft of the tibia, and involved the muscles over the big bone or shin-bone or tibia. There was also a little separate nodule. Well, that was evidence there the tumor had got out from its original place and was spreading. And the bone of the fibula itself—you could see with the naked eye that the bone itself was involved more definitely than you could see it the first time. In other words, the tumor had spread up and down the point where the tumor had been taken out—up and down, and also spreading in this other bone, and involved the muscles. It was an advanced tumor. It was more advanced than the first time it was removed. As I say, the measurements of this tumor—you see, the tumor was spreading around, and the measurements were not so easily obtained, so that the definite statement of the size is not made. But from the description, it was larger than it had been before evidently, and was showing more signs of spreading. The fact that the tumor had recurred, and had grown so rapidly since the last operation, is an indication of malignancy. * * * In my opinion, if a man had a history of two operations, one in February and one in July, 1929, for a fibrosarcoma, and showed up in February 1931, with pleural effusions, and along about the first of April you would draw anywhere from a pint to a quart of yellowish straw like fluid, and a few days later he would fill up and would draw off more fluid and it gets up to the point where the fluid is being drawn off every other day, that is, yellow straw colored fluid, and that continued on and X-rays were made and some X-rays were made while they were drawing off that fluid and it increased at all times and instead of getting better by aspirating, it continued to get worse and the X-rays of the chest were made, that is, three were made, and the X-rays were examined and the history given that upon such history and condition it would be my first opinion that that was a sarcoma mestatasis, with the history of that sort and with the repeated X-rays showing the tumor as I understand the findings.

* * * If the insured, Mr. Harmon, who was found suffering with pleural effusions in April 1931, and who was aspirated for such condition, the same would have been relieved by the aspiration had such condition been caused by the 'flu that he had in January or February 1931. But, if the pleural effusion that he had in April, and was aspirated on for had been caused by fibrosarcoma, it is not likely that this would have cured such condition. That probably would keep on forming as long as the man lived. Pleural effusions is quite characteristic of fibrosarcoma of the lung or any malignant tumor, or any tumor of the lung."

It was after the second operation that the assured made application for the policy of insurance in question, on the warranty that he was in sound health (Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755), and answered the question, "Has person now or ever had * * * Cancer," with "No". In his effort to obtain insurance he stated to the local soliciting agent that his trouble was "liable to come back," referring to the cause of the amputation.

As indicated, the evidence is in dispute as to the fact that insured was operated on for *fibrosarcoma,* and his foot and part of his leg so infected removed in February and again in July, 1929; that after these operations he was not cured; that insured stated to the soliciting agent that he was not insurable because of his operations for that "bone tumor."

The wife, as a witness, testified: "So Mr. Harmon said—Mr. Batson, I can't get any insurance. Mr. Batson said yes, if you had had this insurance with this disability feature when you lost your leg, you would have gotten double the amount. And he said, well, I can't get any insurance; I have been advised that I can't get any insurance on account of the bone growth on my leg. Mr. Batson told him: I can get you an insurance policy without a medical examination. He said, we might have to take out the disability clause in it; I think I can get you one through all right without a medical examination."

The evidence is without dispute that fibrosarcoma is a malignant cancer affecting sound health.

We adhere to the announcements made on first appeal as to the law of the case. When applied to the facts before us, as to whether the plaintiff was in sound health on March 30, 1930, when he was inflicted with a malignant tumor or cancer of the bone of the leg, that he had been twice operated on therefor and was advised by physicians of the probability of a recurrence—facts materially affecting the risk—we are at the conclusion, and hold that the preponderance of the evidence is, that assured was not in sound health at the time of making the warranties and representations of sound health and freedom from cancer, which increased the risk of loss and materially affected the question of coverage of the policy when delivered.

It results that, though defendant was not entitled to the affirmative charge requested, his motion for a new trial should have been granted on the grounds just stated. Cobb v. Malone & Collins, 92 Ala. 630, 9 So. 738; Alabama Midland Railway Company v. Johnson, 123 Ala. 197, 26 So. 160. The judgment of the trial court was therefore in error in overruling the motion for a new trial, and for this error is reversed and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.

### On Rehearing.

THOMAS, Justice.

■ We tried to indicate the respects in which the evidence on the last two trials was materially different, or that it was not "substantially the same evidence"; and that the rule of the statute, Code, § 9519, and Doe ex dem. Windsor Realty Co. v. Finnegan, 216 Ala. 431, 113 So. 277, should not be applied. However that may be, several questions of evidence and arguments of counsel to which exceptions were reserved are pressed for consideration and appear necessary for decision.

■ In the statement of the case to the jury and in argument, an immaterial and prejudicial issue was presented—whether or not the first operation was properly or skillfully done. This was of no concern to the defendant, who was in no wise bound or to be affected thereby. However, the jury, under such immaterial issues and argument, may not have been able to follow the material evidence presenting the question of vitiating misrepresentations or breach of warranty vel non when the policy was applied for, issued, and delivered.

■ There was yet another question of fact admitted in evidence and commented upon in argument that should not have been

admitted or argued, and with which the minds of the jurors may have been and were, no doubt, confused, viz., the personal knowledge of the soliciting agent as to assured's previous and then physical condition when the policy was delivered. This is illustrated by the argument of plaintiff's counsel, saying:

" 'The agents saw this man day in and day out, and they knew that because they saw him day in and day out that his leg was cut off above the knee.'

"The defendant objected to said statement on the ground that there is no evidence in the case to that effect. Thereupon, the Court said: 'I don't think that there is any evidence that they saw him day in and day out.' Counsel for the plaintiff then said: 'You can assume that they collected thirty cents a week.'

"The Court overruled the defendant's objection to said statement and made this statement: 'He is just probably arguing his inference from the testimony.' To this action of the Court, the defendant then and there in open court duly reserved an exception."

This was an improper argument, highly prejudicial, and not founded on the evidence.

Application overruled.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.