10 So.2d 276

**NEW YORK LIFE INS. CO. v. ZIVITZ.**

**6 Div. 900.**

Supreme Court of Alabama.

Oct. 22, 1942.

Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellant.

Leader, Hill & Tenenbaum and Jas. L. Permutt, all of Birmingham, for appellee.

382

LAWSON, Justice.

Appellee was named beneficiary in a policy insuring the life of her son, Charles Zivitz, who died September 15, 1939, and brought this suit to recover thereon. There was verdict and judgment for plaintiff, from which defendant appeals.

The cause of action was stated by the plaintiff in one count, which was in Code form, and the pleadings thereto were in short by consent, the general issue, with leave to give in evidence any matter which, if well pleaded, would be admissible in defense of the action, to have effect as if so pleaded, including a plea of tender in the sum of $30.49; and with like leave to the plaintiff to give in evidence any matter which, if well pleaded, would be admissible in reply to such defensive matter, to have effect as if so pleaded.

The policy and the application therefor, a copy of which is attached thereto, constituted the entire contract between the insurer and insured by the terms of the contract, and the policy further provided that: "All statements made by the Insured shall, in the absence of fraud, be deemed representations and not warranties, and no statement shall avoid this Policy or be used in defense to a claim under it, unless it is contained in the written application and a copy of the application is indorsed upon or attached to this Policy when issued."

The sole defense interposed by the defendant was that misrepresentations were made in the written application, in response to which the policy made the basis of this suit was issued, a copy of which application was attached to, and made a part of said policy of insurance, which misrepresentations materially increased the risk of loss under said policy.

It is the contention of the appellee, plaintiff below, that there were no misrepresentations in the application which could have materially increased the risk of loss, if relied upon by the insurer. The appellee also contends that, although there might have been misrepresentations upon which the appellant, the insurer, might have had a right to rely, it did not, in truth and in fact, actually rely thereon to a material extent, because the application showed on its face that it was made by an eleven-year-

old boy, and that it was for the jury to determine whether or not reliance was had on the contents of the application.

■ Misrepresentations made in an application for insurance will not defeat or void a policy of insurance unless it appears that: (1) The representations were false; (2) they were made either with the actual intent to deceive, or unless the matter misrepresented increased the risk of loss; and (3) the insurer relied upon them to his prejudice. Sovereign Camp, W. O. W., v. Moore, 232 Ala. 463, 168 So. 577; Metropolitan Life Ins. Co. v. Chambers, 226 Ala. 192, 146 So. 524.

■■ The application for the insurance was signed on March 13, 1939. The policy was issued on March 21, 1939, with a provision therein to the effect that it was issued in consideration of the application therefor, a copy of which was attached to and made a part of the contract of insurance. The contract itself shows that the application was an inducement to the issuance of the policy of insurance. There is nothing in the evidence to indicate otherwise, unless it can be said that the mere fact that the application shows on its face that it was signed by a minor refutes the statement in the policy that it was issued in consideration of the application. We do not think this to be so. Misrepresentations need not be the sole inducement to the contract, nor the chief influence leading to action. It is enough if, as a contributory influence, they operate upon the mind and conduct of the other party to any material extent. Reliance Life Ins. Co. v. Sneed, 217 Ala. 669, 117 So. 307; Metropolitan Life Ins. Co. v. Dixon, 226 Ala. 603, 148 So. 121.

It has been held in several Rhode Island cases that an infant is not bound by his warranties in an application for life insurance, and that a beneficiary who has made no statements and did not procure the policy with knowledge of the falsity of the matters warranted is not precluded or estopped from recovering on the policy upon the minor's death. O'Rourke v. John Hancock Mutual Life Ins. Co., 23 R.I. 457, 50 A. 834, 57 L.R.A. 496, 91 Am.St.Rep. 643; Keenan v. John Hancock Mutual Life Ins. Co., 50 R.I. 158, 146 A. 401; Monast v. Manhattan Life Ins. Co., 32 R.I. 557, 79 A. 932.

The subject of representations and warranties made by infants in insurance applications is discussed generally in Couch's Cyclopedia of Insurance Law, Vol. 4, § 823, in the following language: "§ 823. Representations and warranties by infant. —Applying the theory that, since an infant may repudiate his contracts, representations and warranties by an infant are not binding upon him during infancy, it has been held in Rhode Island that while, as a general rule, the defense of infancy is a personal privilege, still, if the contract purports to have been made with a minor, a beneficiary who has made no statements, and did not procure the policy with knowledge of the falsity of the matters warranted, is not precluded or estopped from recovering on the policy upon the minor's death. Notwithstanding this decision, we fail to comprehend why a warranty by an infant constitutes, when false, no defense to an action by the beneficiary to recover upon the policy in a case of this character. And, as a matter of fact, support in insurance law for a contrary conclusion is found in a Kansas case, in which the court, in holding that a beneficiary cannot disaffirm a warranty on the ground that the applicant was a minor, and at the same time enforce the policy, expressly disapproved the Rhode Island decision. And, in New Jersey, it has been expressly held that a false and fraudulent representation as to a material fact, made by an infant over fifteen years of age in procuring life insurance, constitutes a defense good as against the beneficiary, the insured having died before attaining majority."

The case of Metropolitan Life Ins. Co. v. Brubaker, 78 Kan. 146, 96 P. 62, 65, 18 L.R.A.,N.S., 362, 130 Am.St.Rep. 356, 16 Ann.Cas. 267, expressly disapproves the Rhode Island rule. It is there said: "The insured was a minor when the contract was made and at the time of his death. In the case of O'Rourke v. John Hancock Life Ins. Co., 23 R.I. 457, 50 A. 834, 57 L.R.A. 496, 91 Am.St.Rep. 643, the court held a minor is not bound by the warranties contained in a contract for life insurance, but that the policy is nevertheless enforceable against the insurer. In this state a minor is bound, not only by contracts for necessaries, but also by all other contracts, unless he disaffirms them within a reasonable time after he attains his majority. If he disaffirm, he must restore to the other party all money or property received by him, by virtue of the contract, and remaining

within his control. Gen.St.1901, § 4183. This contract was not disaffirmed by the minor. It is binding upon him until disaffirmed, and the court knows of no one who can exercise the right to disaffirm except the minor. But if the plaintiff be allowed to represent the minor, the same consequences must follow as if the minor had acted. The contract of insurance is an entirety, and the statute gives the minor no right to disaffirm provisions which he finds burdensome, and to enforce those which are to his advantage. If any material portion of the contract be disaffirmed, unexecuted provisions fall. The warranty is an integral part of the contract. It is an indispensable condition of liability on the part of the insurer. If the warranty be disaffirmed, liability on the contract must necessarily be destroyed. The contract cannot be disaffirmed, and then money be taken from the company by virtue of the contract, when the return of such money, if it were in the minor's hands, would be a necessary element of disaffirmance. The Rhode Island case is disapproved."

To like effect is the case of Prudential Ins. Co. of America v. Ordonoff, 122 Pa. Super. 485, 186 A. 391.

■ We prefer the rule laid down in the Kansas and Pennsylvania cases and we, therefore, hold that where the evidence shows that a contract of insurance was issued in consideration of the application therefor, the mere fact that the application was signed by an infant is not evidence of the fact that the application was not relied on by the insurer as an inducement to the issuance of the contract.

We believe, however, that the evidence in this case, in all events, precludes the beneficiary from relying on the fact that the representations were made by an infant, even under the Rhode Island rule.

On March 13, 1939, Dr. Greene Smith, a medical examiner on the approved list of the insurer, called at the drug store operated by Nathan Zivitz, the father of the insured. He there made a physical examination of insured and asked those questions contained in Part II of the Application for Insurance, some of which questions are hereafter set out. There is very little in the evidence to indicate that any of the questions were answered by the insured, although his father stated that he (the insured) might have answered one or two of them. It is clear to us from the evidence that the questions were answered by Mr. and Mrs. Zivitz, who were both present during the examination. However, after the examiner had recorded the answers made by Mr. and Mrs. Zivitz to the questions, the application was signed by Charles Zivitz, the insured, who, under the evidence, could sign his name and read the English language. There is nothing in the evidence to indicate that the examining physician failed to record correctly the answers given by Mr. and Mrs. Zivitz. He testified that the answers which he wrote into the application were as given to him. Mr. Zivitz, however, while admitting that he answered questions propounded to him by the examining physician, testified that he did not remember whether or not he answered the particular questions, the answers to which the defendant contended contained misrepresentations which materially increased the risk of loss, but he does not expressly contradict the statement of Dr. Smith that he did answer the questions in the manner in which they appear in the application, except as to question 11 in Part II of the application. To like effect are the answers made by the appellee, Mrs. Zivitz, to the defendant's interrogatories as to whether or not she answered the questions propounded by the examining physician as to her son's prior illness and treatment by physicians.

■ As will be hereafter shown, the appellee knew of the past illness of her son, the insured, and of the fact that he had been treated by several physicians while suffering with a serious ailment. In view of these facts, the defendant should not be precluded from defending on the ground of misrepresentations as to these facts, contained in the application, solely because the application was signed by her minor son, the insured. This conclusion is in accord with the decision in Pacific Mut. Life Ins. Co. v. Hayes, 200 Ala. 246, 76 So. 12, where approval is given to the principle that where misrepresentations are attributable to a beneficiary or to a third person, the misrepresentations defeat the rights of the beneficiary.

■ The fact that the insurance company made an examination of its own does not absolve the declarant from speaking the truth, nor lessen its right to rely on his representations. Reliance Ins. Co. v. Sneed,

217 Ala. 669, 117 So. 307, 310; Brown v. Supreme Lodge, K. P., 225 Ala. 114, 142 So. 388.

The alleged misrepresentations upon which the defendant based its defense are included in the following questions and answers, which appear in the application for insurance:

| Question | Answer | | |
|---|---|---|---|
| 7.B. Have you ever been under observation or treatment in any hospital, asylum or sanitarium? | No | | |
| 8. Have you ever consulted a physician or practitioner for or suffered from any ailment or disease of <br> B. The Heart, Blood Vessels of Lungs? | No | | |
| 10. Have you ever consulted a physician or practitioner for any ailment or disease not included in your above answers? | No | | |
| 11. What physicians or practitioners, if any, not named above, have you consulted or been examined or treated by within the past five years? | Dr. H. A. Harris Bgham, Ala. | 1938 Jan | Coryza duration 3 days no sequele |

The application represents on its face, therefore, (1) that the insured had never been under observation or treatment in any hospital, asylum or sanitarium; (2) that the insured had never consulted a physician or practitioner for or suffered from any ailment or disease of the heart, blood vessels or lungs; (3) that the insured had never consulted a physician or practitioner for any ailment or disease not included in answers set out theretofore in the application; (4) that in answer to the question, "What physicians or practitioners, if any, not named above, have you consulted or been examined or treated by within the past five years?," only Dr. H. A. Harris, of Birmingham, Alabama, is mentioned, who was consulted in January, 1938, when the insured was suffering with a head cold (This illness is referred to in the answer to question 11 as coryza.).

It is insisted by appellant that under the evidence it was entitled to the affirmative charge, and that the trial court committed error in refusing the charge, which was duly and timely requested. It is also insisted by the appellant that the trial court erred in overruling the motion to set aside the verdict of the jury in favor of the plaintiff and the judgment rendered thereon, and to grant to the defendant a new trial.

The evidence in this case is without dispute that the cause of insured's death was bacterial endocarditis, which is described as an inflammation of the lining on the inside of the heart. Such disease is given as the cause of the death in the proofs of death submitted by the physicians. There is no evidence to the contrary. Therefore, the statements of such physicians are conclusive as to the cause of death. National Life & Accident Ins. Co. v. Puckett, 217 Ala. 110, 115 So. 12; Cotton States Life Ins. Co. v. Crozier, 216 Ala. 537, 113 So. 615. The evidence is in dispute as to how long the insured suffered with the illness which ultimately caused his death. In the proof of death submitted by Dr. H. A. Harris it appears that the insured had suffered with the disease which caused his death since April 6, 1939. In the proof of death submitted by Dr. C. C. McLain it appears that the disease was of four or five years duration. Certain it is, however, under the evidence, that he was afflicted from April 6, 1939, which was only a few weeks after the policy sued on was issued.

Dr. Joe Hirsh, a witness for the defendant, testified in substance as follows: That he examined the insured on July 3, 1935, when he was called into consultation by Dr. H. A. Harris, the family physician who had charge of the case, at which time he made a definite diagnosis of subacute bacterial endocarditis. That he visited the insured at his home on several occasions and thereafter visited him at the South Highlands Infirmary on July 23, 1935, where the insured remained until July 30 thereafter. He stated that while he was treating and examining the insured he told his father and mother that he had diagnosed his illness as subacute bacterial endocarditis and that in his opinion the disease would end fatally, if not from that attack, from a subsequent attack. That this diagnosis was based on the fact that blood cultures revealed that the insured was suffering from an infection in the blood stream known as streptococcic hemolytic infection and that this fact, together with other symptoms which the insured had, led him to make the positive diagnosis that he was suffering at that time with subacute bacterial endocarditis. Dr. Hirsh further testified that one of the most dangerous types of germs is the hemolytic streptococcus, which may get in the blood stream from several sources. That hemolysis causes disintegration of the blood vessels, giving the person afflicted secondary anemia, and that in a certain percentage of the cases where a person has hemolytic germs in the blood stream, the germs are lodged along the margin of the valves of the heart, thereby causing little wart-like growths on the edge of the valves of the heart, wherein the germs may become lodged, and that from time to time these germs may be thrown out of the growths and get in the blood . stream and cause further trouble. He testified that "endocarditis" is an inflammation of the heart valves or the inner lining of the heart, which is called the endocardium. That the term "subacute" means that the individual may have an acute flare-up, and that the history of the disease of subacute bacterial endocarditis demonstrates that after a time it is a recurring one. That after quieting down for a time, it flares up again. That there are other terms that are given to the disease, such as malignant endocarditis, recurrent endocarditis and infectious endocarditis. That during the periods of time when the disease is quiescent, the little wart-like growths remain on the valves of the heart and during this period, the person afflicted might not have any symptoms which can be detected on an examination, and that the mere fact that an examination made with a stethoscope does not reveal a heart murmur does not indicate that the person does not have subacute bacterial endocarditis in a quiescent or dormant stage.

He further testified that he was called in to see the insured again on May 30 and June 13, 1939, at which time he reached the conclusion that he had a recrudescence or flare-up of the former condition of subacute bacterial endocarditis. He testified that he had treated over two hundred cases of subacute bacterial endocarditis and had not seen one of them get well, although the first attack does not necessarily prove fatal immediately, as the person afflicted may have recurrent attacks.

The testimony of Dr. H. A. Harris who, as we have before stated, was a witness for the plaintiff and who was the family physician, is in part as follows:

"In 1935, when Charles Zivitz had his spell of illness, he had what was known as Streptococcic hemolytic infection of the blood stream. In my opinion, he completely recovered from that." * * * (In answer to the question propounded on cross-examination, "You also determined that he had what you call a subacute bacterial endocarditis?," he answered:) "That was a question of opinion. In my opinion, his heart was in good shape. * * * Dr. Joe Hirsh did not give me a diagnosis of subacute bacterial endocarditis in 1935. * * * We did numerous blood cultures before he went to the hospital and after he went to the hospital, and after numerous tests were made, it demonstrated the type of organism, which was streptococcic hemolytic infection of the blood stream. * * * Streptococcic hemolyticus is a germ that attacks the system. * * * When it gets in the blood stream, of course, it is a very dangerous condition. That is the condition which Charles Zivitz had. We call it very virulent. * * * The two worst infections which you can have are streptococcic hemolyticus and streptococcic veridans. I said that one is about as bad as the other. When a man has a streptococcic hemolytic infection of the blood stream, all of the organs in his body are more or less affected, because every organ in the body has to have blood. It

causes certain ones of the organs in the body to become inflamed. It affects two of the most vital organs which a person has—the heart and kidneys. A streptococcic hemolytic infection of the blood stream very often causes inflammation of the kidneys and heart. It causes inflammation of the inner lining of the heart, which is known as the endocardium. It can produce subacute bacterial endocarditis, which means inflammation of the inner lining of the heart, and which is a serious condition. It is very serious. In my opinion, Charles Zivitz did not have subacute bacterial endocarditis in 1935. Such is the opinion which I had then and also the opinion which I have now. * * * By the term, 'Prognosis,' is meant, what you expect to happen. That is a forecast. From a medical standpoint, where a person has a streptococcic hemolytic infection of the blood stream such as Charles Zivitz had in 1935, the prognosis is always very grave. At the time when Charles Zivitz was sick in 1935, and we developed he had a streptococcic hemolytic infection of the blood stream, my prognosis with reference to his case was very bad. I told his parents that. We all realized that it was very bad, that is, that his future outlook—that is, the future of his life was very bad. The acute illness was the thing that I was most concerned about. The prognosis was grave, in regard to the acute illness. He overcame the acute illness. He got well, apparently. It is always very uncertain where a person has had a streptococcic hemolytic infection of the blood stream, such as Charles Zivitz had, as to what damage has been done to the various organs in the body. I said that it causes inflammation of the various organs, such as the heart and kidneys. After the inflammation has subsided, and a person has recovered, you have to base the amount of permanent injury to those organs on the way that the patient acts and the physical signs. It is uncertain as to what extent there has been permanent damage. We can't see inside. You can't tell until you perform an autopsy. They say that one of the things that happens in inflammation in the lining of the heart, or endocardium, in endocarditis is that it causes little warts or nodules on the valves of the heart. A certain amount of that happens. Nobody can tell from outward manifestations or symptoms just how much of that condition has resulted, where you have had an endocarditis. * * *

"When Charles Zivitz was taken sick in 1939, I called in Dr. McLean. I think Dr. Hirsh saw him one time. Dr. McLean was called first and I then called Dr. Hirsh. Dr. Hirsh and I disagreed on the subject of whether his condition in 1939 was a recrudescence of the condition that existed in 1935. Dr. Hirsh was of the opinion that it was a recurrence and I was of the opinion that it was not. I asked Dr. Hirsh when he went to Mayo Clinic to ask the doctors up there if there was anything that they could do for the little boy. When the little boy was sick back in 1935, I had Dr. Hirsh to write to some doctors in New York about him. I realized then that he was in serious condition. I discussed with the parents about writing to some doctors in New York. I discussed with them about taking the little boy to New York. The doctors in New York had a very divided opinion. They did not recommend bringing the little boy up there. They recommended giving him blood transfusions, which we did. Some of the doctors said there was nothing to be done for him back in 1935. I told the father that. I made a diagnosis of what caused his trouble when he died. He died of an acute endocarditis. I made a diagnosis of an acute bacterial endocarditis, which was the cause of his death."

On redirect, Dr. Harris testified:

"*In my opinion, in 1935, Charles Zivitz had an acute endocarditis, probably due to the hemolytic infection of the blood stream.*

"Question: In 1939 he had fully recovered from that illness, hadn't he? Answer: I saw him repeatedly, almost daily, and he did everything anybody else's boy did.

"Question: And he was thoroughly recovered. Answer: Yes, sir."

On recross, he testified: "After he was sick in 1935, at which time I said he finally recovered, I advised the mother and father to have the little boy come to me for a check up. I have forgotten how often I told them to come. He did not come once a month. He came up quite often. He came up to see me every few weeks. I think I advised the parents to have him come to see me once or twice a year, to keep a check. I did that because we didn't want to take any chances. We knew he was sick the first time. I was not uncertain about his condition after he got well in

388

1935. I just wanted to be sure that the boy stayed well, if I could help him. He came back on an average of at least twice a year from 1935 up to the time he was taken sick in 1939." (Italics supplied)

It appears, therefore, that the answers to questions 7B, 10 and 11 are patently untrue. It is without dispute in the evidence that the insured was under observation and treatment during the month of July, 1935, at the South Highlands Infirmary and the West End Baptist Hospital, where he was suffering with an infection in the blood stream known to the medical profession as a streptococcic hemolytic infection. The presence of this disease, according to the evidence, was determined by blood tests and personal examinations made by the attending physicians. Aetna Life Ins. Co. v. Norfleet, 232 Ala. 599, 169 So. 225; New York Life Ins. Co. v. Horton, 235 Ala. 626, 180 So. 277.

The answer to question 8B of the application ("Have you ever consulted a physician or practitioner for or suffered from any ailment or disease of the heart, blood vessels or lungs?") is likewise false insofar as it denies that the insured had ever consulted a physician or practitioner for or suffered from any ailment or disease of the heart. The attending physicians differed as to the type of heart trouble, but a careful reading of the evidence discloses that both were of the opinion that he was suffering with endocarditis which, under the undisputed evidence, is an inflammation of the lining of the heart. Dr. Hirsh was of the opinion that he had subacute bacterial endocarditis, a recurring disease, while Dr. Harris diagnosed his illness as acute endocarditis.

■ The falsity of representations made in the application for life insurance as to previous diseases will not defeat a recovery on a policy so issued, unless made with intent to deceive or unless the matter misrepresented increased the risk of loss. Code of 1940, Title 28, Section 6; Sovereign Camp, W. O. W., v. Fischer, 236 Ala. 494, 183 So. 653; Metropolitan Life Ins. Co. v. Chambers, 226 Ala. 192, 146 So. 524. The same is true of representations touching consultation with or treatment by a physician. It must appear that they relate to some serious ailment material to the question of life expectancy. Metropolitan Life Ins. Co. v. Dixon, 226 Ala. 603, 148 So. 121; Sovereign Camp, W. O. W., v. Moore, 237 Ala. 156, 186 So. 123; New York Life Ins. Co. v. Hoffman, 238 Ala. 648, 193 So. 104.

■ There are types of fatal maladies of which the courts take judicial knowledge, such as "tuberculosis, cancer and Hodgkin's disease," as materially increasing the risk of loss. New York Life Ins. Co. v. Horton, 235 Ala. 626, 180 So. 277; Brotherhood of Railway and Steamship Clerks, etc., v. Riggins, 214 Ala. 79, 107 So. 44; Aetna Life Ins. Co. v. Norfleet, 232 Ala. 599, 169 So. 225. We cannot say, however, that such is true of the blood infection with which the insured was suffering in 1935, although in our opinion the evidence shows conclusively that he was so afflicted. As has been heretofore pointed out, the presence of this disease was established by blood tests and personal examinations made by the attending physicians. Aetna Life Ins. Co. v. Norfleet, supra; New York Life Ins. Co. v. Horton, supra.

■ The evidence is in conflict as to the type of heart trouble with which the insured was afflicted in 1935, if any. The proof does not establish the fact that the insured was suffering with a heart disease, regardless of its nature, in the same manner as it established the presence of the infection in the blood stream. The proof in regard to the heart trouble was merely the opinion of expert witnesses. As has been said in the case of New York Life Ins. Co. v. Torrance, 228 Ala. 286, 153 So. 463, when different opinions exist by the experts or their statements merely express their opinion as a deduction drawn from certain symptoms, though there is no conflict, the conclusion is finally with the jury and the affirmative charge should be withheld.

■ Although the evidence is without dispute that the insured was seriously ill in 1935 with a blood stream infection, we believe that the evidence of apparent good health, considered with the testimony of Dr. Harris that in his opinion the insured completely recovered from that illness, affords a reasonable inference of fact within the scintilla rule as to whether or not the misrepresentations materially increased the risk of loss. The affirmative charge, therefore, was properly refused. Mutual Life Ins. Co. of New York v. Mandelbaum, 207 Ala. 234, 92 So. 440, 29 A.L.R. 649; Commonwealth Life Ins. Co. v. Brandon, 232 Ala. 265, 167 So. 723; Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So.

755; Metropolitan Life Ins. Co. v. Usher, 226 Ala. 314, 146 So. 809.

That brings us down to a consideration of the question whether, under the evidence adduced upon the trial, the trial court committed error in refusing to grant defendant's motion for a new trial. We have considered, carefully, all the evidence offered by both sides; and after allowing all reasonable presumptions in favor of the correctness of the jury's verdict, we are forced to the conclusion that it is contrary to the great weight of the evidence, and should have been set aside on proper motion. This motion was made by defendant, and overruled by the court, and exception duly reserved. In overruling this motion, the court committed error, which must lead to a reversal. Cobb v. Malone, 92 Ala. 630, 9 So. 738; Sovereign Camp, W. O. W., v. Gunn, 224 Ala. 444, 140 So. 410; Metropolitan Life Ins. Co. v. Usher, supra; Commonwealth Life Ins. Co. v. Brandon, supra.

Reversed and remanded.

GARDNER, C. J., and BOULDIN and FOSTER, JJ., concur.