179 So.2d 161

**BLUE CROSS–BLUE SHIELD OF ALABAMA**

v.

**Jean MORGAN.**

**8 Div. 947.**

Court of Appeals of Alabama.

Oct. 5, 1965.

Watts, Salmon, Roberts & Stephens, Huntsville, for appellant.

ages for breach of its hospital service contract in favor of Jean Morgan.

The defendant's plea was in short by consent with leave to give in evidence any matter which, if well pleaded, would be admissible.

The contract was attached to and made a part of the complaint and was also introduced in evidence.

On March 1, 1961, defendant issued to plaintiff and her husband, J. C. Morgan, its hospital certificate, with surgical benefit rider. Mrs. Morgan was admitted to the St. Thomas Hospital in Nashville, Tennessee, on April 18, 1961, and on April 25th an operation was performed on her back. The bills for hospitalization and surgery were presented to appellant. Payment was denied on the ground that the illness for which the operation was performed was in existence prior to the issuance of the policy.

As to "pre-existing conditions" the contract provides that hospital service and surgical benefits thereunder shall not be available to any member for any condition, disease, or ailment, congenital or otherwise (known or unknown) which existed on the date his coverage thereunder became effective, or for which medical or surgical treatment or advice had been rendered within one (1) year prior to the date of his coverage thereunder becoming effective, until the said member shall have been covered by Blue Cross hospital service contract and by Blue-Shield Surgical and Anesthetist Benefit Rider or Riders for a period of nine (9) consecutive months immediately preceding the date of hospital admission.

The testimony at the trial consisted of that of plaintiff's husband, of plaintiff, and the depositions of two doctors, Dr. Carl McCandlish and Dr. Charles David Scheibert, which were read into evidence.

J. C. Morgan testified he was married to plaintiff on March 1, 1961, and that she was covered by his contract with Blue

Jos. T. Conwell, Huntsville, for appellee.

PRICE, Presiding Judge.

Insurer, Blue Cross-Blue Shield of Alabama, appeals from a judgment for dam-

Cross-Blue Shield of Alabama. She entered the St. Thomas Hospital on April 18, 1961, and was discharged about May 5, 1961. His wife presented the bills to the defendant corporation for payment and she has received bills repeatedly from the hospital and Dr. Scheibert, demanding payment. He further testified that he is no longer married to plaintiff.

The plaintiff testified she had a membership card with Blue Cross-Blue Shield of Alabama that showed the effective date was March 1, 1961. The card was introduced in evidence. She was admitted to St. Thomas Hospital on April 18, 1961. She testified, over objection, that her hospital bill totaled $789.15, and that she had continued to receive bills for the hospital care. The itemized bills were introduced in evidence over defendant's objection. The plaintiff also identified a bill from Dr. David Scheibert, the doctor who performed the operation, in the amount of $450.00 and this bill was introduced in evidence over defendant's objection. A bill from Dr. Frist in the sum of $75.00 was also admitted in evidence against objection. Plaintiff stated she was in a semi-private hospital room and that she paid the hospital the $25.00 deductible in her hospital service contract.

The plaintiff testified she woke up in the night of April 1, 1961, hurting all over and very sick. She first thought she had a virus infection. She waited three or four days and then contacted Dr. McCandlish. He ran a check on her bladder and kidneys and then sent her to Nashville, where Dr. Scheibert operated on her back. Prior to April 1961, she was being treated for kidney and bladder infection and surgery was performed on her bladder three times. She stated she had never had trouble in the area of her back where the operation was performed. She did not remember clearly anything that was said at the hospital concerning the history of her illness. Each time she discussed her condition with the physicians there she was under the influence of drugs.

The deposition of Dr. McCandlish, a Urologist of Huntsville, Alabama, was introduced in evidence and read to the jury. The doctor stated that plaintiff had been his patient since November of 1959. At that time she consulted him in regard to pain in her right flank region. She had some nausea and vomiting and was having difficulty passing urine. He made a tentative diagnosis of a possible horseshoe kidney and cystitis. Treatment was administered, consisting of medication, sitz baths and diet. Plaintiff was seen at recurring intervals for urinary tract infections, backaches, right-side hip pains. She was seen again on January 2, 1960, January 9, and January 29, with the same complaints and on July 18, 1960, with the additional complaint of pain in the right flank region. The pain was below the short ribs, which come off the eleventh and twelfth thoracic vertebrae, just below the rib cage. She was hospitalized on several occasions for treatment of the back pain, but primarily for treatment of the cystitis and difficulty in voiding. The back pain was not necessarily a part of the cystitis. She was seen again on August 9, 1960.

Dr. McCandlish stated his patients are referred to him and he treats only the urological or kidney aspect of the condition. If they need neurological examination or a general workup they are referred to another physician. No examination or diagnosis of neurological trouble was undertaken. No X-rays were made with the theory of ascertaining if there was any trouble with her nerve roots.

Sometime in April, 1961, Dr. McCandlish referred the patient to a Dr. Frist in Nashville for a complete work-up and studies in regard to her general physical condition. After extensive tests Dr. Frist determined she did not have a true horseshoe kidney and her symptoms were not due to any primary kidney disease. Because of some definite neurological changes in her back and abdomen he referred her to a Dr. Scheibert, a Neurosurgeon, for consultation.

Dr. McCandlish received a report from Dr. Dave Scheibert stating that the nerve roots on the right side of the twelfth Thoracic and first Lumbar Vertebrae were severed in the operation. The witness further stated that according to the Nashville diagnosis the operation performed there actually had no relation to anything previously done to the patient by Dr. McCandlish. The letter of April 28th from Dr. Scheibert was the first time witness knew she had this type of ailment.

The area that was operated on was in the lower thoracic and upper lumbar region and the flank pain mentioned earlier is lateral to the spine in that region. The kidney area is in the same region. An incision about three or four inches long was made in plaintiff's back.

Dr. McCandlish's records from August 9, 1960, until September 21, 1961, are missing, and the last record he has of seeing Mrs. Morgan was August 9, 1960. His records show that on her visits between November of 1959 and August, 1960, she complained of pain in the right flank area. The examinations made by him were strictly along the lines of the urinary tract and there was no examination of her back. He stated he must have felt that the condition of which she complained was not arising out of the bladder or kidney or he would not have referred her to Nashville.

The deposition of Dr. C. D. Scheibert, on direct examination was introduced in evidence by the defendant. Dr. Scheibert testified he was a Neurosurgeon residing in Nashville, Tennessee. He stated that about April 19, 1961, he was asked by Dr. Thomas Frist to see plaintiff in consultation for consideration of a pain in the back, the right flank, over the right hip and into the inside of the right thigh. At this time she was a patient at St. Thomas Hospital.

The patient's history could be divided into two parts. The part which was not directly connected with the reason for which Dr. Scheibert saw her consisted of the fact that 22 months previously she had suffered a bout of urinary retention or inability to pass her water. This, he understood, was cared for successfully by Dr. McCandlish in Alabama. She had been in his care and apparently had had symptoms suggesting inflammation and pain of the lower urinary tract.

The more pertinent history, for which the witness was asked to see the patient, was that six months before the date of consultation she noted a spontaneous onset of pain in the lower area of the back near the short ribs, greater on the right side, and this pain continued around the back, through the flank, above the crest of the right hip and down in the right groin to the suprapubic area; this was an aching pain which was at first intermittent, and tended to become worse as the day went on. In the last month before consultation this pain had become persistent and more severe. The patient had also noticed there was a hypersensitivity or increased feeling to touch. The patient told him she had for several months vomited during the more severe episodes of pain and had lost 25 pounds of weight in the previous six months.

After the patient was given a G. I. series and other tests it was determined that none of her organs in the abdomen were responsible for her pain. The witness first thought there was a possibility of nerve root irritation caused by a ruptured or protruding disc, or that there was a slight possibility of a spinal cord tumor. After further tests and studies it was determined that surgery be carried out with the idea that if a ruptured disc existed it would be removed and if there was no evidence of some abnormality compressing or exerting pressure against one of these nerve roots, the nerve root would be sectioned to alleviate the pain. Dr. Scheibert testified he operated on plaintiff and finding no ruptured disc, overgrowth of bone or other obvious cause of nerve root irritation, he severed three nerves. He has talked with plaintiff on two occasions since the operation and she has indicated that she was free

of the complaint for which she was operated on.

The doctor stated that in developing the history of the patient he read the reports furnished by other doctors who had treated her. Dr. McClellan's note was in the form of an operative note having to do with cystoscopy, and in his notes he stated that for the past few years the patient had had intermittent bouts of abdominal pain within the back, associated nausea, etc.

He also had a history worked up with Dr. Baker of a long history of urinary trouble. In answer to a question propounded to him by defense counsel the witness stated that based on the history obtained by him from Mrs. Morgan, the medical records, the findings of other doctors who had attended or examined her and his diagnosis of her it was his opinion that the condition, disease or ailment which occasioned her admittance to the hospital and the operation performed by him existed on March 1, 1961.

On cross-examination the witness stated that the symptoms he mentioned are subjective symptoms. Subjective symptoms are symptoms that the patients themselves give. Objectively and on examination he found that her reaction to pin prick and touch in an area that corresponded to the distribution of the T-12 or L-1 nerve roots was over-sensitive to painful or touch stimulation. On examination of her back she stated that percussion or being struck a blow over the area of the short ribs, the twelfth thoracic and first lumbar vertebrae, caused pain in the area that she had described and it was also found that there was tenderness to the right of these spines.

The doctor also stated if there had been evidence that her complaint was associated with disease in the bladder, kidney or bowel he would not have performed the operation; that by the time the studies were done there were no suggestions of any other discoverable cause.

In response to the question, "Then you don't actually know whether it was pre-existing," the doctor said, "All I know is the patient stated that the pain for which I saw her began six months previous to the date of my first consultation." He stated that to the best of his knowledge the plaintiff was given some tranquilizers of normal dosage and some medication for relief of pain, but she at no time impressed him as though she might not be in command of her senses.

The trial court charged the jury that the maximum damages plaintiff could recover, if they were reasonably satisfied from all the evidence that she was entitled to recover, would be the sum of $989.15, $789.15 for hospital bill and $200.00 for surgical bill, the maximum surgical benefit provided by the contract. The jury assessed the damages at $989.15.

█ The burden was upon the defendant to establish the facts which would relieve it of liability under the limiting provisions of the contract. National Security Insurance Company of Elba v. Tellis, 39 Ala.App. 455, 104 So.2d 483; United Security Life Insurance Company v. Hilyer, 41 Ala.App. 226, 128 So.2d 736.

"* * * when different opinions exist by the experts or their statements merely express their opinion as a deduction drawn from certain symptoms, though there is no conflict, the conclusion is finally with the jury. * *." New York Life Ins. Co. v. Zivitz, 243 Ala. 379, 10 So.2d 276, 143 A.L.R. 321.

█ We are of opinion the evidence adduced presented a question for the jury as to whether plaintiff's disease which caused the loss was in existence when the policy was issued, and that it was sufficient to sustain the verdict. There was no error in the refusal of the motion to exclude the evidence nor in the denial of the motion for a new trial, based on the ground of a pre-existing illness.

The hospitals in which services were to be furnished are defined in the contract as (a) "Member Hospitals," meaning any Alabama hospital with which Blue Cross has a contract for the furnishing of hospital service. (b) "Non-member Hospitals," any hospital not a member hospital, but which is recognized or approved as a general medical and/or surgical hospital by the Alabama Hospital Association or by the American Hospital Association or by any other State hospital association. The contract further provides that "Inter-Plan Service Benefit Bank" is a reciprocal arrangement among Blue Cross Plans whereby a member of one Blue Cross Plan receives benefits available through another Blue Cross Plan located in the area where hospitalization occurs.

\*　　\*　　\*　　\*　　\*　　\*

"1. If a member is admitted to any non-member hospital which is a participant in the Inter-Plan Service Benefit Bank, while the Corporation is a participant therein, he shall be entitled to those services available through another Blue Cross Plan located in the area where hospitalization occurs. \* \* In the event the Corporation is not a participant in the Inter-Plan Service Benefit Bank at the time a member is admitted to a non-member hospital, the member shall be entitled only to the allowances set forth in the following paragraph 2 of this Section."

The appellant insists there is no evidence in the record which would support the conclusion that St. Thomas Hospital, located in Nashville, Tennessee, is a "Non-member" hospital which is not a participant in the Inter-Plan Service Benefit Bank, or that it is a "Non-member" hospital which is a participant in the Inter-Plan Service Benefit Bank while the Corporation is a participant therein, and if the latter, what the amounts of benefits would be in Tennessee under the plan. Also, that the contract provides that a subscriber shall not be entitled to surgical benefits unless she is at the same time entitled to benefits under the terms of the hospital service certificate. Thus, the plaintiff has failed not only to prove that she was in an approved hospital but also has failed to establish the amount of recovery to which she would be entitled under the contract.

■ The hospital certificate and surgical benefit rider state that Blue Cross-Blue Shield of Alabama is a non-profit corporation. We take judicial knowledge that Title 28, Sections 304–316, Code 1940, is the only statute which provides for the establishment of a hospital service plan by non-profit corporations. Section 308 of said Title 28 provides that a corporation organized under the provisions of said article may enter into contracts with the public, subject to the restrictions therein contained, for benefits under said hospital service plan.

> "Such contracts may provide for more than one class of service or benefits, and \* \* \* shall designate the hospitals which render the service provided for, \* \* \*."

No hospital is designated in the contract. In the absence of such designation, or some other notice to plaintiff, we are of opinion that whether the Tennessee hospital was a participant or non-participant in the "Inter-Plan Service Benefit Bank, while the Corporation is a participant therein," and the amount of benefits available through the Blue Cross Plan located in that area, was a defensive matter to be proved by Blue Cross-Blue Shield. This was a matter peculiarly within the knowledge of defendant, or one which it had superior means of ascertaining.

■■ There was no testimony as to the reasonableness of the hospital bills and medical services. Birmingham Amusement Co. v. Norris, 216 Ala. 138, 112 So. 633, 53 A.L.R. 840; United Security Life Ins. Co. v. St. Clair, 41 Ala.App. 243, 130 So.2d 213. This question was properly raised by a ground of the motion to exclude the evidence. Conner v. Hamlin, 33 Ala.App.

54, 29 So.2d 570. For the refusal to grant said motion the judgment is reversed and the cause remanded.

Reversed and remanded.

CATES, Judge (concurring in part).

All members of the court are unanimous that the judgment below must be reversed. We divide, however, as to the reasons and as to the scope of the quantum of proof needed for the plaintiff to have made a prima facie case.

## I.

Since the statute requires the appellant to designate in its contract certificate the hospitals which honor its plan and since the instant policy fails so to designate, I conclude that the plaintiff was not required to prove the Tennessee hospital was within the elaborate inter plan bank formula. Since the contract was primarily for a flat prepaid hospitalization, albeit aleatory in frequency, Blue Cross had equal, if not superior, means to find out whether the Tennessee hospital was affiliated with the nexus of Blue Cross member hospitals.

Therefore, the charges of such hospital were presumptively within the realm of what Blue Cross knew or should have, by reasonable diligence, known. Being for a flat prepaid service, reasonableness of the hospital charge was beside the point.

## II.

As to the charges of the doctors, the mere fact that Blue Cross lists maximums in its policy for prepaid medical accumulations to pay for surgery is not a substitute for proof that the doctors' bills were reasonable and customary in the vicinity in which performed.

## III.

Hence, the majority hold the trial court was not in error in refusing to require the plaintiff under this evidence to prove reasonableness of the charges of the hospital in Tennessee. Otherwise, we concur with PRICE, P. J.

JOHNSON, J., concurs in this separate opinion.