4 So.2d 410

## EQUITABLE LIFE ASSUR. SOC. OF UNITED STATES v. KING.

8 Div. 127.

Supreme Court of Alabama.

Oct. 9, 1941.

Rehearing Denied Nov. 13, 1941.

Howze & Brown, of Birmingham, for appellant.

Jas. E. Smith, Jr., of Tuscumbia, for appellee.

BROWN, Justice.

Action of assumpsit by the beneficiary named in an insurance policy alleged to have been issued to the insured Charles F. King, Jr., "on or about the 7th day of June, 1939 * * * who died on or about August 18th, 1939," of which fact defendant had notice.

The defendant's plea 2 avers that in the application for the issuance of the policy was a stipulation made by the insured, in these words: "I hereby agree that any policy issued hereon shall not take effect until the first premium thereunder has been paid during my good health." That the first premium was paid "on to-wit July 5, 1939, and that at the time said premium was paid the insured was not in good health." Plea 3 was the same as plea 2, except it was more specific as to the condition of the insured's health, to wit, that he was "suffering from *malaria, aenemia and a dilated condition of his heart.*" [Italics supplied.]

There are other pleas relating to the condition of the insured's health June 1, 1939, the date of the application, but that question is not material to the insistences made on this appeal, which are: the court erred in refusing the defendant's general affirmative charge, which it requested in writing, and in overruling its motion for a new trial.

The policy on its first page contains the following statement: "This policy is executed at the Home Office of the Society in New York, the seventh day of June, 1939, hereinafter called the Date of Issue."

The evidence goes to show that it was placed in the hands of the insured by the defendant's agent on June 26, 1939, and that he signed a receipt therefor in the following words: "Received from W. M. Goodwin, 20 pay Life Policy G. N. 10, 945, 412; for Inspection. It is understood that this policy is not to go into effect until note is given for the amount of Premium."

The note given in payment of the premium bore date of July 5, 1939, but the testimony given by the insured's father, and the defendant's agent, Goodwin, goes to show that it was executed and delivered to Goodwin between the middle and last of June, 1939.

. The defendant's medical witness, Dr. Maxwell, on direct examination, testified:

"I examined Charlie F. King, Jr., on July 3d, 1939, at my office in Sheffield. I found him suffering from anemia. He had been having chills and fever and was suffering from malaria, then, too, he had a dilated heart. He had a dilated heart, missing heart, the muscle tissues to the heart had given away, circulation was poor, had dilated some of the muscles, indicating that the circulation was not in a normal condition. In my opinion that heart condition was a serious one. I prescribed for the malarial condition and his heart condition. . I told him to go home and go to bed as long as his heart condition continued; rest was one of the most particular things to carry out. * * * This trouble was bound to have developed after he developed the malaria and that was—well I had to take the history. I examined him just as a patient and not for insurance."

On cross-examination, this witness testified: "I remember so well that it was on July 3d that Mr. King was in my office because I put it on a book. I always put it on a book when a man comes in my office if I don't forget it. I gave him a prescription. My recollection is I gave him a prescription that day; I gave him some prescription for the malaria. That is not all, I gave him some medicine from the office, that is my recollection. Yes, I gave him something for his heart when I first saw him. I don't recall whether I gave him a prescription for that or not. * * * With reference to the malaria, I did not make any blood examination because it was so powerful I did not believe it was necessary. Yes, I based my opinion that he had malaria on the fact that when he came to me he told me that he had had a chill and on his general condition; he had a temperature and the history of chills. Of course a man does have a temperature without having chills. I did not make a blood examination as to the malaria, that is not the only positive way; we used to treat for malaria before we ever thought of blood tests. No, I was not necessarily treating in the dark. I would not swear to the jury that this man's blood had malaria in it; it was my opinion that he had malaria. I will not swear it. Often they have it and it does not show. I did not take the blood test to see whether it showed up or not."

The testimony of this witness further goes to show that his opinion that the insured's heart was dilated was based on a stethoscopic examination.

The testimony of the other medical witness was to the general effect that a diagnosis for malaria, without taking a blood test, was more or less guess, and that a stethoscopic examination of the heart to determine whether or not it was dilated was uncertain and unreliable. That anemic condition from malaria could develop in a short period of time, depending on the type of malaria and the care the patient took of himself.

The testimony of the medical witnesses, in some respects, is in sharp conflict, and the defendant offered a statement in writing, in form of a letter, from the father of the insured to the defendant in respect to the date of the payment of the premium and the condition of insured's health which contained the following statement: "I know of my own knowledge that a note was given to Mr. W. M. Goodwin by my son for an annual premium on this policy on or about July 5, 1939, and that I signed the note as endorser for my son. Mr. Goodwin delivered the policy in person to my son, and the note was handed to Mr. Goodwin by my son, the insured, and in so far as any of us knew my son, Charlie F. King, Jr., was in perfect health at that time. He died on Aug. 18, 1939, after receiving a blow over the heart while playing with a friend after attending church on the night of Aug. 16, 1939. He seemed to be all right the next day but complained with his heart on the night of Aug. 17, 1939, at which time we put him under the doctor's care."

Defendant's witness, Gates, prepared the statement which was presented to the insured's father, and it was signed in his presence and in the presence of Mr. Dent, the assistant manager of the company for the State of Alabama. Gates was the manager for the North Alabama District.

He testified on cross-examination: "I told him we wanted the letter as a statement of facts. No sir, I did not tell him that there would not be any question about the policy being paid. I had no authority to make any statement like that. I told him I hoped he got his money, that I thought he was due it, just like I would tell any man. I don't think I told him there was not anything in the letter that would hurt him and for him to sign it. No, I don't think there is anything in the letter to hurt his claim, but I told him I wanted a statement of the facts, I had to get that for the company. Mr. Dent is the Assistant Manager of the company for the State of Alabama. He is general manager of the state business. He was present when this letter was written and signed."

The evidence is without dispute that the prescription given to the insured by Dr. Maxwell was a commercial chill tonic sold as patent medicine.

The written statement as to the general good health of the insured at the time of the delivery of the policy and the cause of death, in the circumstances stated above, was in the nature of an admission against interest on the part of the insurer, whose general agent prepared it and procured it to be signed for and at the instance of the defendant insurer, and was in contradiction of the testimony of the defendant's medical witness. Cotton States Life Ins. Co. v. Crozier, 216 Ala. 537, 113 So. 615.

Viewing the evidence as a whole we are clear to the conclusion that the question as to the exact date of the first premium was paid and whether or not at that time the insured was in good health, was for the jury. The affirmative charge for defendant, therefore, was well refused.

We are further of opinion that the evidence pointing to the conclusion that the insured was suffering from anemia, malaria and dilation of the heart is not so strong and compelling as to warrant the granting of a new trial. National Life & Accident Ins. Co. v. Puckett, 217 Ala. 110, 115 So. 12.

This disposes of the questions argued.

Affirmed.

GARDNER, C. J., and THOMAS and FOSTER, JJ., concur.