64 So.2d 122

**METROPOLITAN LIFE INS. CO. v. FOX.**

1 Div. 644.

Court of Appeals of Alabama.

Dec. 16, 1952.

Rehearing Denied Feb. 10, 1953.

Vickers & Thornton, Mobile, for appellant.

Johnston, McCall & Johnston, Mobile, for appellee.

HARWOOD, Judge.

This case was originally assigned to Presiding Judge CARR. In the opinion prepared by him, and which now appears as the dissenting opinion, some of the basic and undisputed facts are set forth. We have not repeated such facts in this opinion. For this reason a better understanding of this opinion will result if these facts be secured by first reading the dissenting opinion.

The majority of the court being of the opinion that the appellant was entitled to have its motion for a new trial granted on the grounds that the verdict was contrary to the great weight of the evidence, our conclusions, and the reasons therefor follow.

In addition to the facts set out in the opinion of Judge CARR, the record further shows facts whose probative force is, to us, highly significant.

C. D. Brasell, Jr. was an employee of the insured, Mr. Fox, from 1946 until his

death, and saw him practically every day during this time. Mr. Fox, during this time, sometimes complained to the witness about an upset stomach, and at various times during his employment this witness saw Mr. Fox taking alka-seltzer.

Dr. Newman testified that he was a specialist in obstetrics, had never treated Mr. Fox professionally, and his relationship with Mr. Fox was social only.

Apparently, as a friend, Dr. Newman arranged for Mr. Fox's admission to Ochsner Clinic, in New Orleans, Louisiana, when Mr. Fox felt he "might well have a checkup."

After Mr. Fox had spent four days in Ochsner Clinic the report of their examination was forwarded to Dr. Newman. This report is set out in full in Judge Carr's opinion.

This report specifically states that X-rays of insured's upper intestinal tract "revealed a small niche deformity along the lesser curvature side at the base of the duodenal cap at the level of its juncture with the pylorus. This represents evidence of ulceration. There is essentially no deformity of the duodenal cap and no tenderness or pylorospasm."

Thus taken as a whole the report does specifically state that there was a small niche deformity of the base of the duodenal cap, though essentially the cap itself was not deformed.

In this connection it might be well to interpolate that Dr. Raider, a specialist in radiology, testified that the degree of deformity of the duodenum resulting from an ulcer depends first upon the depth of penetration of the ulcer, its duration, and the existence of previous ulcers in the cap.

The defense introduced the records pertaining to insured of Ochsner Clinic made during the period of insured's examination. The general history given to the clinic by the insured was as follows:

"This 33 year old white male states that about 10 years ago he developed burning and gnawing pains in the epigastrium which generally occurred about ten or fifteen minutes after meals. These pains were accompanied by distention and a slight relief was obtained by belching, but more relief could be obtained by taking alka seltzer, and slight relief could also be gained by taking soda. There was much nausea and some vomiting. He gives no history of vomiting food taken prior to the previous meal. He has never noticed any particularly offensive foods, as far as his complaints are concerned, but he says that all types of foods seem to cause it at some times and then on other occasions nothing seems to precipitate the attacks. He states that he can eat spicy and fatty foods with as much immunity as other types of food. However, he does report that the attacks are almost certain to follow ingestion of alcoholic beverages."

Dr. Edgar H. Little, of the staff of Ochsner Clinic, a specialist in radiology and with many years experience, testified that he had no independent recollection of examining the insured, as he examines fluoroscopically thousands of patients yearly. These examinations are made in a darkened room and he does not see the patient's face. This witness' recollection also was not aided by examination of the record. However he testified that the written report of his examination was made on the day of the examination, represent his work, and was correctly made.

▇ Under such conditions the record was the equivalent of a positive present statement of the witness affirming the truth of the contents of the record. Acklen's Ex'r v. Hickman, 63 Ala. 494; Roll v. Dockery, 219 Ala. 374, 122 So. 630, 65 A.L. R. 1473.

Dr. Little stated that the record of his fluoroscopic examination of Mr. Fox 16 October 1944 showed that on that day he found there was a small niche deformity along the lesser curvature side at the base of the duodenal cap, and that this repre-

sented roentgenological evidence of ulceration; that there was no essential deformity of the cap, no tenderness, and no pylorospasm. His examination indicated that Mr. Fox had a duodenal ulcer at that time, and that he would state that Mr. Fox did have a duodenal ulcer on that date.

Dr. Little had also examined the plates of the X-ray examination of Mr. Fox made in the clinic two days prior to the fluoroscopic examination. These plates revealed the same conditions found by Dr. Little in his fluoroscopic examination.

Dr. Raider, the specialist in radiology, testified as an expert witness for the defense. Dr. Raider stated that the best method of determining the existence of an ulcer is an exploratory operation and examination of the tissue; the second best method is examination by X-ray. In an X-ray examination the first and pathognomonic and undisputed demonstration of an ulcer is the finding of a crater or niche, and the existence of a crater or niche can indicate nothing other than an ulcer.

Dr. Paul M. Goldfarb, a specialist in internal medicine, testified as a witness for the defense.

Dr. Goldfarb testified that he had never known Mr. Fox until he was called to see him on 28 November 1948. He found Mr. Fox vomiting blood and also passing blood from the rectum. He called an ambulance and Mr. Fox was taken to the Mobile Infirmary.

Dr. Goldfarb, at the hospital, wrote down the history given him either by Mr. Fox or Mrs. Fox. Among other things this history discloses: "Duodenal ulcer discovered 5 years ago but has not taken care of it."

Mr. Fox bled considerably while in the hospital and died on 30 November 1948.

The final diagnosis made by Dr. Goldfarb on 30 November 1948 was: 1. Gastrointestinal hemorrhage from duodenal ulcer. 2. Acute myocardial insufficiency.

Dr. Goldfarb further testified on cross examination that he could not be one hundred per cent certain that Mr. Fox had a duodenal ulcer without actually seeing the tissue, but that his clinical impression was that he had an ulcer, and he believed he did.

Dr. Newman, whose testimony has in part been mentioned above, and also in Judge CARR's opinion, testified as a witness for the defendant.

Dr. Newman testified that it had been his teaching that deformity of the duodenal cap was one of the cardinal findings of the existence of an ulcer, and that absence of deformity would be evidence of a healthy condition, and he felt that that is the way radiologists would look at it.

Every one he has seen with a duodenal ulcer has had tenderness at the spot, and he would not suspect an ulcer without pain. Further he would think that the absence of pyloric spasms would be evidence that there was no ulcer.

In answer to the question: "Q. Now, then, if a man were found to have no deformity of the duodenal cap, no tenderness, no pylorospasms, would that be persuasive to you that he did not in fact have a duodenal ulcer?" Dr. Newman replied as follows: "It would be reported especially here—and we have some good radiologists —I get reports from them all along—not only do they do a lot of X-raying, and are equipped to do that, they do a lot of palpation under direct fluoroscopic visualization, and it would be reported negative. I have been here perhaps five years, and believe we have excellent radiologists here."

Dr. Newman further testified that the symptoms of gastritis and duodenal ulcers are practically the same, and cause a lot of confusion among diagnosticians. Also, that "My experience has been that radiologists hedge a lot on their interpretations, and rather often give you reports that are non-committal in making no firm diagnosis." If the anatomy is abnormal a number of interpretations are permitted, depending on who looks at the film. The interpretation of X-ray films is given to error. However, Dr. Newman thought that Ochsner Clinic would not tolerate any but the best radiologists.

Dr. W. R. Meeker, a physician and surgeon, testified as an expert witness for the plaintiff.

Dr. Meeker testified that the usual symptoms of a duodenal ulcer are deformity of the duodenal cap, local tenderness, and pylorospasm. However, on cross examination Dr. Meeker testified that: "Many of them have no effects at all, and are discovered at autopsy, and many patients had never given any history of any trouble whatever."

On direct examination the record shows the following questions propounded to, and answers by Dr. Meeker:

"Q. And if those things did not exist, if there was no deformity of the duodenum, no tenderness there, and no evidence of pylorospasm, you say that would, in your opinion, indicate that there was no disease there? A. It would be a negative examination, yes, sir.

"Q. And that there was no duodenal ulcer, is that right? A. Yes, sir."

Dr. Meeker further testified the symptoms of gastritis and duodenal ulcer may often be confused.

During the examination of most of the expert witnesses the plaintiff's counsel addressed to them questions seeking testimony as to the absolute validity of the representations shown by X-ray pictures. These questions were substantially to this effect:

"Q. Does an X-ray picture always truthfully show the condition of that part of the human anatomy which it purports to be a picture of?", and

"Q. May the condition of an organ or a part of the human anatomy always be determined by reading or interpretation of an X-ray picture of that organ or part of the human body."

Dr. Newman's answers were that it had been his experience that radiologists hedge a lot on their interpretations, and rather often give reports that are noncommittal in making a firm diagnosis. He was sure it was true that shadows on an X-ray film may often deceive, but "I don't profess any radiological ability."

Dr. Warren answered the questions with a simple no, with no elaboration, though he stated that X-ray films may oft times deceive.

Dr. Goldfarb testified that in the hands of a competent man X-ray pictures of the stomach and duodenum were "probable 98%" accurate.

Dr. Raider stated that X-ray pictures were always a true record, though extraneous factors could cause defects that simulate pathology, though such defects do not deceive the trained observer.

Dr. Meeker answered the questions in the affirmative, and stated that of all X-ray work gastro-intestinal X-rays are the most difficult to make so as to truthfully reflect the condition they purport to depict.

■ As stated in Judge CARR's opinion, it is the settled rule that misrepresentations made in an application for insurance will not defeat or void a policy unless it appears that: (1) The representations were false; (2) they were made either with actual intent to deceive, or unless the matter misrepresented increased the risk of loss; and (3) the insurer relied upon them to his prejudice.

The evidence is uncontradicted that the insured was a patient in Ochsner Clinic for four days in October 1944. The answers to questions 5, 12, and 13 on the application were false.

■ It is further our conclusion that the great weight of the evidence tends to establish that Mr. Fox was suffering from duodenal ulcer at the time of his stay in the clinic.

Such was the diagnosis made at the clinic after fluoroscopic and X-ray examinations, which revealed a niche deformity along the lesser curvature side at the base of the duodenal cap. According to Dr. Raider,

the finding of a niche can indicate nothing but an ulcer. We do not find this statement contradicted in any of the evidence, unless it be argued that the testimony of Dr. Meeker that if there was no deformity of the duodenum, no pylorospasm, and no tenderness, it would be his opinion that no ulcer existed. However Dr. Meeker also testified that hundreds of patients show no symptoms of duodenal ulcer whatsoever, and the condition is discovered only at an autopsy.

The real weakness in the probative value of Dr. Meeker's above statement relative to the existence or absence of an ulcer is however that his reply was to a question which failed to hypothesize the material fact on which it is clearly inferable the diagnosis of the Ochsner Clinic was based, namely that their X-ray and fluoroscopic examinations revealed a niche deformity along the lesser curvature side at the base of the duodenum.

It is further our conclusion that the testimony of Dr. Little, and Dr. Goldfarb, the only two physicians who based their opinions on actual physical examinations of the insured, is not seriously contradicted by the statements of some of the experts to the effect that X-ray films do not always truthfully show the condition of the anatomy they picture, or may be misread, and that the symptoms of duodenal ulcers and gastritis are often confusing.

Other than Dr. Little, none of the medical experts had actually seen the X-ray films, or the fluoroscopic picture of the insured made in the Ochsner Clinic. To deny the validity of these pictures or films we must assume they were improperly made or improperly read. Such conclusion would rest on surmise and speculation, for certainly there is no evidence tending to show such defects, other than the general statement that X-ray films are not always accurate, or are not always correctly read.

In fact, Dr. Meeker, the plaintiff's expert witness, testified that in a case where he was not called upon to make a diagnosis, and a diagnosis had been made by Ochsner Clinic, he would be inclined to accept it, and the same would be true as to a diagnosis made by Dr. Goldfarb.

Likewise, the general statements of some of the medical experts to the effect that the symptoms of ulcer and gastritis are similar and sometimes confused, is not sufficient in probative weight to satisfactorily overcome the firm diagnoses of the two doctors who · actually examined the insured and as a result of such examinations diagnosed his ailment as a duodenal ulcer.

Particularly is this true in light of the X-ray and fluoroscopic showings of a niche or crater, which according to the undisputed evidence of Dr. Raider could mean only one thing, that the patient has an ulcer.

It is our conclusion that the great weight of the evidence tends to establish that Mr. Fox did have a duodenal ulcer at the time he was a patient in Ochsner Clinic, and at the time of his death.

The sole remaining question is therefore did the matter misrepresented increase the risk of loss.

In this connection all of the medical experts questioned upon the subject, with the exception of Dr. Meeker, testified that a duodenal ulcer did increase the risk of death.

Dr. Farnham, assistant medical director for the defendant company, who had approved the application of Mr. Fox for insurance, further testified that in approving the application he had relied a great deal on the answers therein showing no illness; that a duodenal ulcer would definitely affect the risk of loss, and that life insurance companies generally, acting reasonably in accordance with their usual practice and custom would not issue a policy if they had knowledge that the applicant had had an ulcer approximately two years and nine months previous to the application, though some companies might consider issuing a policy on a rated basis providing further X-ray examinations and studies were made and the applicant had been free of symptoms for a long period of time.

Dr. Goldfarb testified that in his opinion Mr. Fox died sooner, by reason of having a duodenal ulcer, than he would have died had he not been so afflicted, and he would say that he died prematurely.

The only evidence tending in anywise to conflict with uniform views of the medical witnesses testifying on this question of increased risk by reason of duodenal ulcer is the following testimony of Dr. Meeker:

"Q. Now, Doctor, I believe you have testified to some of the consequences of duodenal ulcer, and one of the consequences which you mentioned was perforations. What is meant by a perforation when you are referring to a duodenal ulcer? A. It means that the ulcer has progressed in burrowing through the walls to the extent that the contents escape into the peritoneal cavity.

"Q. Since that is a possible consequence of a duodenal ulcer, would you say that the risk of death of a person having a duodenal ulcer was greater or less than one who did not have a duodenal ulcer?

"Mr. Johnston: Objected to as incompetent, immaterial and irrelevant, and because it invades the province of the jury, on the very matter to be decided by the jury.

"Court: Overrule.

"A. Yes, there is certain risk in all diseases, which must be taken into consideration, comparing them to patients who don't have those diseases.

"Q. And that is true of duodenal ulcer? A. Yes, sir.

"Q. And so a person who is suffering from a duodenal ulcer is a greater risk than one who doesn't have one? That is true, isn't it? A. It is true in a small proportion of cases.

"Q. But it is true though? A. Yes, sir."

Analysis of Dr. Meeker's above testimony leaves doubt as to whether, in its probative tendencies it does actually conflict with the testimony of the other medical experts as to whether a duodenal ulcer increases the risk of death. This aside, it is our conclusion it is insufficient in its probative value to overcome the great weight of the evidence of the other medical experts to the effect that duodenal ulcer does increase the risk of death.

Furthermore it in nowise contradicts Dr. Farnham's testimony to the effect that life insurance companies generally, acting reasonably in accordance with their usual practice and custom would not have issued a policy had the fact been revealed in the application that the insured had an ulcer two years and nine months previously.

In Metropolitan Life Ins. Co. v. Dixon, 226 Ala. 603, 148 So. 121, 122, the late Chief Justice Gardner wrote:

"A material risk is any previous affection which might reasonably have been considered a menace to the prolongation of the life of the insured, and that, had it been revealed, the application would have been rejected."

Along this same line, in Sovereign Camp, W. O. W. v. Moore, 237 Ala. 156, 186 So. 123, 125, Judge Bouldin defined increased risk of loss as follows:

"The risk of loss is increased if the matter misrepresented be so material to the question of life expectancy that an insurer may have reasonably declined to accept the risk if the truth had been revealed."

The uncontradicted evidence shows that the insured was a patient in Ochsner Clinic for four days.

The great weight of the evidence tends to show that he was at this time suffering from a duodenal ulcer. Two years and nine months thereafter he applied for the insurance policy in question, and stated in such application that he had never had any ailment or disease of the stomach or intestines, and had visited no clinics or physicians within the previous five years. Some 14

months after the policy was issued the insured died. His attending physician listed the cause of death as gastro-intestinal hemorrhage from duodenal ulcer, and acute myocardial insufficiency. In the history given this attending physician by either the insured or his wife was the statement "duodenal ulcer discovered 5 years ago but has taken no care of it."

█ Not to conclude that the great weight of the evidence tends to show that this insured's affliction did increase the risk of loss in this case would be to deny all reasonable inferences to be drawn from such facts.

It is our conclusion therefore that the verdict and judgment rendered and entered in the court below is against the great weight of the evidence and this cause should be reversed and remanded.

Reversed and remanded.

CARR, P. J., dissented.

CARR, Presiding Judge (dissenting).

The basis for this appeal is a judgment in the court below in favor of the beneficiary on a policy of life insurance.

The policy was issued by the appellant on the 1st day of August, 1947. The insured, Charles James Fox, died on the 30th day of November, 1948.

The application for the policy contract bears date of the 18th day of July, 1947.

Questions numbered 5, 11(c), 12(g), and 13, and answers thereto appearing in the application are pertinent to our review. They are:

"5. Have you ever been an inmate of a hospital, sanatorium, asylum or cure whether for observation, examination or treatment? If yes, give date, duration, nature of ailment and name of institution.

"(Answer) Yes. Laceration of left cheek, 1943, Providence Hosp. Dr. Doehring. Complete Recovery."

"11. Have you ever had any ailment or disease of

"(c) The Stomach or Intestines, Liver, Kidneys or Genito-Urinary Organs?

"(Answer) No."

"12. (g) Have you consulted a physician for any ailment or disease not included in your above answers?

"(Answer) No."

"13. What clinics, hospitals, physicians, healers or other practitioners, if any, not named above, have you consulted or been treated by, within the past five years. If none, so state.

"(Answer) None."

The cause was submitted to the jury on the complaint in one count and on the plea of the general issue and special pleas numbered 6, 7, 9, and 10.

Plea 6 alleges in effect that the answer given to question 5, supra, was false in that insured had been a patient in October 1944 at the Ochsner Clinic for duodenal ulcer with which he was then suffering, which malady increased the risk of loss to the insurer.

Plea 7 contains similar allegations but bases its averments on the alleged falsity of the answer to question 11(c), supra.

Plea 9, in the same aspect, relates to the answer to question 13, and plea 10 to the answer to question 12(g).

These questions are presented for our review by: (1) The refusal of the general affirmative charge in defendant's behalf. (2) The action of the trial judge in overruling appellant's motion for a new trial. (3) The propriety of the refusal of certain written instructions which were tendered by the defendant.

In October, 1944 Mr. Fox, the insured, was given a physical examination at the Ochsner Clinic in New Orleans, Louisiana. The appointment was arranged by Dr. L. D. Newman at the request of Mr. Fox.

The physical examination finding was reported to Dr. Newman in the following letter:

"Ochsner Clinic
Prytania & Aline Streets
New Orleans, Louisiana

October
27
1944

Dear Dr. Newman:

Following is a report on Mr. Charles Fox whom you referred to the Ochsner Clinic for examination.

X-rays of the upper GI tract revealed a small niche deformity along the lesser curvature side at the base of the duodenal cap at the level of its juncture with the pylorus. This represents evidence of ulceration. There is essentially no deformity of the duodenal cap and no tenderness or pylorospasm. Cholecystograms were normal and chest x-ray was negative.

The following laboratory examinations were normal: serology; sedimentation rate; hematology, including smears for malaria; blood sugar and serum protein; cephalin flocculation; test for febrile antigens; and urinalysis. Stool examinations revealed the presence of hookworm.

A thorough examination in the Department of Urology failed to reveal any genito-urinary disease. The patient was finally observed in the Department of Internal Medicine. I would suggest that with the subsidence of activity of the duodenal ulcer he be treated for hookworm which may or may not be producing symptoms at this time. In regard to the duodenal ulcer an ulcer regime, et cetera, would seem to be indicated.

Sincerely yours,
Edgar W. Warren, M. D.
mab

Dr. L. D. Newman
Bay Minette
Alabama
cc—Dr. Goldfarb
12–2–48—my."

Apparently Dr. Warren did not personally assist in the examination of Mr. Fox. The indicated findings were taken from a report of the examination made by and under the direction of Dr. Edgar Little.

Dr. Newman saw Mr. Fox frequently after the latter returned from the clinic. He testified:

"When a consultation letter arrived, I preserved it, and shortly afterwards I saw Mr. Fox, and Mr. Fox wanted that letter, and it was given to him. Then when the X-rays were taken, I asked for them and secured them. He wanted them and asked the clinic for them and they sent them."

It appears that Dr. Newman did not give any special importance to the contents of the letter. In this aspect he testified:

"A. I don't recall the letter at all.

"A. (continuing) I honestly don't. I didn't pay any attention to it. I didn't think he was ill. He didn't look like it.

"Q. After reading that letter, does it refresh your recollection? A. Not too much, no. That is my name on the letter. His being ill didn't impress me too much. He was quite robust. I don't think he discussed it with me.

"Q. But you do remember the report from Ochsner Clinic to him? A. Yes.

"Q. And the X-ray plates? A. Right.

"Q. And you delivered the report and the X-ray plates from the Ochsner Clinic to Mr. Fox? A. Right."

The physician testified in effect that Mr. Fox appeared to be enjoying good health. He was "a big, strong, strapping man," and weighed 180 to 185 pounds. We quote the following excerpt from Dr. Newman's testimony:

"Q. Now, then, Doctor, you say you went on fishing and hunting trips with him? A. Yes, sir.

"Q. And was the food cooked on the boat? A. Oh, yes, sir.

"Q. Did he eat just exactly what the others ate? A. Yes, sir.

"Q. Did he show any evidence of being in ill health from his eating? A. Well; no, sir, he ate.

"Q. Ate the same things you did? A. Yes, sir.

"Q. Did he exhibit any evidence of being in bad health? A. No, sir, if he had any inconvenience from what he ate, he didn't make it manifest to any of us.

"Q. And you all ate fried foods on that trip and every other food that a normally healthy person would eat, didn't you? A. Oh, sandwiches, fish and all sorts of things.

"Q. Do you know of any complaint whatsoever on his part? A. He never gave me any.

"Q. And all that you know about it is just that he said he would like a check-up, and you arranged with Ochsner Clinic for him to have a check-up. Is that right? A. That is it. I called Mr. Underwood. I remember that. It made it much simpler."

As we stated above, Dr. Edgar Little made and supervised the physical examination of Mr. Fox at Ochsner Clinc. At the trial below the doctor did not have an independent recollection of having seen Mr. Fox, nor did he recall the circumstances incident to the examination. His testimony was based on a study of the Ochsner Clinic reports and records. The witness testified:

"Q. Please explain precisely what these records show the condition of Charles James Fox to be at the time of the examination. A. At the time of the examination on 10/14/44 I found that his chest was negative. He had an anomalous variation of his fourth rib which meant nothing—it had no clinical significance whatever. He also had an anomalous or anatomical variation of the 3rd rib on the left. On this same date we examined his gall bladder at which time we found that his gall bladder functioned normally and that there was no gall stones. Two days later on 10/16/44, I examined Mr. Fox myself in the fluoroscopic room and according to my reports I found there was a small niche deformity along the lesser curvature side at the base of the duodenal cap at the level of its juncture with the pylorus. This represented roentgenological evidence of ulceration. There was essentially no deformity of the duodenal cap and no tenderness or pylorospasm. The esophagus and stomach were negative.

"Q. Do the records show Charles James Fox had a duodenal ulcer at the time of the examination? A. My examination indicates that he had a duodenal ulcer at that time."

The doctor stated that the X-ray films were made by technicians without his assistance and when he was not present. He stated also that X-ray pictures always truthfully show the condition of that part of the human anatomy which they purport to depict and that shadows on X-ray plates or films do not deceive an experienced radiologist.

In this respect other radiology experts in their testimony expressed a contrary view. In effect they stated that shadows on X-ray plates and films were deceiving and in many cases would fail to accurately and precisely reflect the true condition of that part of the human body which in fact existed.

The hereinabove quoted excerpt from Dr. Little's testimony contains this statement: "There was essentially no deformity of the duodenal cap and no tenderness or pylorospasm."

Dr. W. R. Meeker as a witness qualified as a medical expert with many years of active practice. At the time of the trial he owned and personally operated an X-ray outfit. His knowledge of radiology and his experience with the technique were in every respect shown to be equal to those of Dr. Little. In fact it appears that both of these physicians have attained very high

standing and eminence in their professional careers.

Dr. Meeker did not examine nor treat the insured. He was among the witnesses who testified that on account of shadows on X-ray plates or films there may appear evidence of conditions in the human anatomy which do not in fact exist. He testified also that if a person had a duodenal ulcer there would be a deformity of the duodenal cap and there would be a local tenderness and usually pylorospasm. The doctor stated that if these conditions were not manifest he would conclude that the duodenum was in a healthy state and free of ulcer. He testified that if a person is suffering from duodenal ulcer his tolerance towards fatty and spicy foods would be poor. His diagnosis of the symptoms of the malady was confirmed by the testimony of other expert witnesses.

Dr. Raymond K. Farnham at the time of the trial was assistant medical director for the appellant. He approved the application for the instant policy in so far as it related to the physical aspect of the applicant. He answered the following question in the affirmative:

"Would the fact, if it is a fact, that Charles J. Fox had been an inmate of Ochsner Clinic in New Orleans, Louisiana, on October 13, 1944, for observation, examination or treatment for duodenal ulcers with which he was then suffering have increased the risk assumed by the Company in the issuance of said policy?"

Dr. Paul M. Goldfarb attended Mr. Fox in his last illness. He had not seen nor professionally attended the insured prior to this time. The doctor first saw Mr. Fox at the latter's home on November 28, 1948. At the time the physician learned that the patient had recently been vomiting blood and also passing it through the rectum. He was forthwith carried to the Mobile Infirmary. After being admitted and before he died at 5:55 A.M., November 30, 1948, he had some other hemorrhages.

The doctor testified that his final diagnosis of the cause of Mr. Fox's death was: "Acute pulmonary edema and gastro-intestinal hemorrhage." In this factual aspect the record discloses:

"Q. What did you base that diagnosis on? A. The physical findings and the history.

"Q. Were you given a history of Mr. Fox's condition? A. Yes, as I recall, I was.

"Q. Do you recall who gave you this history? A. It was either Mr. Fox or his wife, I believe.

"Q. What was that history, Doctor? A. That was that Mr. Fox had had a peptic ulcer for some time—I don't recall just how long—and that he had been sent to New Orleans to the Ochsner Clinic for either diagnosis or treatment.

"Q. Did you write that down on that report there? A. If it is on there, I wrote it, but I don't remember whether I did or not. According to this, I have that he had a duodenal ulcer—

"Mr. Thornton: You did write down the history that he was giving you, did you not? A. That is right.

"Q. When did you write that history down? A. At the time Mr. Fox was admitted to the hospital."

Dr. Goldfarb made out the death certificate and gave as the cause of death:

"Immediate cause of death Acute pulmonary edema

"Due to Anemia resulting from gastro-intestinal hemorrhage

"Other conditions Duodenal ulcer."

During the last illness of Mr. Fox there were no X-rays taken nor fluoroscopic examinations in an attempt in this manner to determine the nature of the malady.

Dr. Goldfarb testified that his clinical impressions at the time he attended the insured were that he had a hemorrhage from a duodenal ulcer. It appears that this impression, together with what he was told with reference to the Ochsner Clinic diag-

nosis, occasioned this notation on the death certificate: "Other conditions Duodenal ulcer."

The following is excerpted from Dr. Goldfarb's cross examination:

"Q. There are thousands of people who have ulcer and live their normal life out, aren't they (sic), Doctor? A. That's true.

"Q. What are the symptoms of gastritis? A. Indigestion, heartburn and belching.

"Q. And they are very similar and practically indistinguishable from the symptoms of ulcer. Is that right? A. That's true.

"Q. So on examining him out there with these hemorrhages, you were unable to tell whether they were due to gastritis or to this other thing, weren't you? A. No, but hemorrhage such as this is not usual with gastritis.

"Q. Well, hemorrhages come from many things, do they not? A. Yes.

"Q. And therefore you were unable then to say he had an ulcer? A. No, I couldn't say."

We have attempted hereinabove to delineate pertinent portions of the evidence. This, we think will serve sufficiently as a basis for a fair review of the presented questions.

Title 28, Sec. 6, Code 1940 provides:

"No written or oral misrepresentation, or warranty therein made, in the negotiation of a contract or policy of insurance, or in the application therefor or proof of loss thereunder, shall defeat or void the policy, or prevent its attaching, unless such misrepresentation is made with actual intent to deceive, or unless the matter misrepresented increase the risk of loss."

In the case of New York Life Ins. Co. v. Zivitz, 243 Ala. 379, 10 So.2d 276, 278, 143 A.L.R. 321, Justice Lawson, writing for the Supreme Court, had this to say:

"Misrepresentations made in an application for insurance will not defeat or void a policy of insurance unless it appears that: (1) The representations were false; (2) they were made either with the actual intent to deceive, or unless the matter misrepresented increased the risk of loss; and (3) the insurer relied upon them to his prejudice."

See also, New York Life Ins. Co. v. Horton, 235 Ala. 626, 180 So. 277; Sovereign Camp, W. O. W. v. Moore, 237 Ala. 156, 186 So. 123.

The record evidence in the instant appeal presents two prime factual questions: (1) Did the insured have a duodenal ulcer at the time he executed the application for the policy. (2) If this query is to be answered in the affirmative, did this malady increase the risk of loss?

These issues are posed by the allegations of special pleas, and the insured assumed the burden of establishing these averments by the required proof. New York Life Ins. Co. v. Hoffman, 238 Ala. 648, 193 So. 104.

We have held that ulcerated stomach is not included among the diseases which, as a matter of law, tend to shorten life and materially increase the risk of loss. Independent Life Ins. Co. v. Vann, 24 Ala. App. 93, 130 So. 520. See also, Protective Life Ins. Co. v. Fischer, 234 Ala. 436, 175 So. 391.

In this aspect the evidence presents conflicting expert views. As we have noted, Dr. Farnham testified that if the insured was suffering from duodenal ulcer on October 13, 1944, this would have increased the risk assumed by the appellant in the issuance of the policy. Dr. Meeker testified that thousands of persons with peptic ulcers will live out their normal lives.

This doctor stated, also, that the symptoms of gastritis and duodenal ulcer may be often confused by medical experts.

We have a long line of authorities which hold that expert testimony is not necessarily binding on the court and jury. To be sure,

this character of evidence is of great potential value, especially in cases of the kind with which we are instantly concerned. The very nature of the factual inquiry impels the dependency upon and reliance on the testimony of men who are trained and experienced in the science of physiology.

Their testimony should not be capriciously rejected nor ignored. It should be weighed, however, in connection with all the facts and circumstances disclosed by the proof. Metropolitan Life Ins. Co. v. Chambers, 226 Ala. 192, 146 So. 524; Metropolitan Life Ins. Co. v. Shaw, 22 Ala. App. 54, 112 So. 179; Booker T. Washington Burial Ins. Co. v. Williams, 27 Ala.App. 393, 173 So. 269; Com. Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755.

Our courts have applied a doctrine which is more favorable to expert testimony when the opinions and conclusions of these witnesses are based solely upon tests and personal examinations and *when such disclosed evidence is not in dispute.* Aetna Life Ins. Co. v. Norfleet, 232 Ala. 599, 169 So. 225; New York Life Ins. Co. v. Horton, 235 Ala. 626, 180 So. 277; Grabove v. Mutual Benefit Health & Accident Ass'n, 241 Ala. 88, 1 So.2d 297.

It is evincingly clear that the latter doctrine cannot be applied in the case at bar. Unquestionably the conflicts in the expert testimony, which we have attempted to illustrate herein above, and reasonable inferences from the evidence which are against the contentions of the appellant forbid us to hold that the insurer was entitled to the general affirmative charge. First Nat. Life Ins. Co. of America v. Rector, 225 Ala. 116, 142 So. 392; Mutual Life Ins. Co. of New York v. Mankin, 223 Ala. 679, 138 So. 265; Metropolitan Life Ins. Co. v. Shaw, supra; Booker T. Washington Burial Ins. Co. v. Williams, supra; Sovereign Camp, W. O. W. v. Davis, 242 Ala. 235, 5 So.2d 480; Sovereign Camp, W. O. W. v. Sirten, 234 Ala. 421, 175 So. 539; Com. Life Ins. Co. v. Harmon, supra; Sovereign Camp, W. O. W. v. Brock, 226 Ala. 579, 148 So. 129; Sovereign Camp, W. O. W. v. Harris, 228 Ala. 417, 153 So. 870; New York Life Ins. Co. v. Hoffman,

supra; Sovereign Camp, W. O. W. v. Rowe, 225 Ala. 336, 143 So. 171; Life Ins. Co. of Virginia v. Mann, 28 Ala.App. 425, 186 So. 583; Independent Life Ins. Co. of America v. Butler, 221 Ala. 501, 129 So. 466; National Life & Accident Ins. Co. v. Puckett, 217 Ala. 110, 115 So. 12; Massachusetts Mutual Life Ins. Co. v. Crenshaw, 195 Ala. 263, 70 So. 768.

We freely confess and are frank to admit that it has not been an easy task to determine whether or not the lower court was in error in denying the motion for a new trial. We have reference to the assigned ground that the verdict was contrary to the great weight of the evidence.

Our official approach to this question is appellate only, a fact well known by the legal profession. Our review cannot be based solely on the fact that we find some substantial conflicts in the testimony. Neither can we decide the inquiry on the premise that if we had been the triers of the facts we would have rendered a different verdict.

The age old system of right of trial by a jury affords a substantial privilege. "The verdict of a jury and the judgment of a trial judge are solemn things" is an oft quoted statement, the verity of which is deeply rooted and embedded in the administration of our laws.

The reviewing courts should not disregard the finding of a jury and the judgment of the trial judge thereon unless a legal and valid reason therefor is made to appear.

What the former Chief Justice, Gardner, wrote for the Supreme Court in Booth v. State, 247 Ala. 600, 25 So.2d 427, 432, is in every respect applicable here:

"Among the grounds of motion for a new trial was the one that the verdict was contrary to the great preponderance of the evidence. The motion was denied. The solution of the questions of fact presented in this case was one not free from difficulty, but was one peculiarly for the jury's determination. The trial appears to have been conduct-

ed with great care. The defendant was vigorously represented by able counsel who was alert to his every interest, and the trial judge likewise appeared to have conducted the trial in such a manner as to safeguard defendant's every right. Under the rule by which we are here guided, there is no justification for a disturbance of the trial court's action in denying the motion for a new trial based upon this ground."

The studious and careful consideration of the instant record forces us to the conclusion that we should not disturb the action of the lower court in the matter of instant concern.

Chief Justice Marshall observed in Ogden v. Saunders, 12 Wheat. 213, 6 L.Ed. 606: "It is a general rule * * * that the positive authority of a decision is co-extensive only with facts on which it is made."

This is indeed true; however we will cite some authorities which in our view lend some analogous support to the conclusion we have reached. Sovereign Camp, W. O. W. v. Brock, supra; Independent Life Ins. Co. of America v. Butler, supra; National Life & Accident Ins. Co. v. Puckett, supra; Equitable Life Assurance Society of United States v. King, 242 Ala. 35, 4 So.2d 410; National Life & Accident Ins. Co. v. Logan, 228 Ala. 409, 153 So. 868; Metropolitan Life Ins. Co. v. Chambers, supra, New York Life Ins. Co. v. Hoffman, supra; Life Ins. Co. of Virginia v. Mann, supra; Metropolitan Life Ins. Co. v. Shaw, supra; Sovereign Camp, W. O. W. v. Rowe, 225 Ala. 336, 143 So. 171.

We come finally to the consideration of the propriety of the refusal of written charges numbered 3 and 4.

The former instruction attempts to present the legal principles which are applicable to special plea number 10. The latter has the same purpose as to special plea number 6.

Charges to be approved should speak "in the correct and appropriate terms of the law." To save error in their refusal the rule of strict construction should be applied. Bragg v. State, 236 Ala. 270, 183 So. 682.

There may be objectional features which could be pointed out in both charges, but we entertain the view that each of them was substantially covered by the court's oral charge. Title 7, Sec. 273, Code 1940.

The court went to some length in explaining to the jury that if the defendant had proven either of his special pleas the plaintiff would not be entitled to recover. He catalogued the various averments of the pleas and instructed the jury with reference to their legal significance and meaning. To illustrate our view would require that we laden this opinion with a very large portion of the court's oral charge.

We have been favored with very able briefs by counsel representing the appellant and the appellee.

It is the considered conclusion of the writer that the judgment below should be affirmed.

On Rehearing.

HARWOOD, Judge.

In his brief in support of the application for rehearing counsel for appellee state that "there is no evidence in the record that:

"* * * X-rays of insured's upper intestinal tract revealed a small niche deformity along the lesser curvature side at the base of the duodenal cap, etc."

and that we erred in so stating in our opinion.

Counsel contend that Dr. Little's testimony related solely to X-rays of the gall bladder, and to his fluoroscopic examination.

We are yet of the opinion that the facts are clear that Dr. Little's testimony, and the records of Ochsner Clinic show clearly that we did not err in our original statement as to this X-ray evidence.

The records of Ochsner Clinic were introduced into evidence through Mrs. Shelby Harvey McCaffrey. Mrs. McCaffrey testified that the Ochsner Clinic makes records and memoranda in regular course of business of patients examined at the clinic. These memoranda are dictated by the doctor as soon as possible, and are typed up in the secretarial pool. Mrs. McCaffrey testified that as medical record librarian of the Ochsner Clinic she has physical custody of such records, and they have been safely kept during her employment. These records disclose that Charles James Fox was a patient in such clinic around 13 October 1944.

We think that under the above testimony the records of Ochsner Clinic were properly received in evidence. Section 415, Title 7, Code of Alabama 1940.

These records disclose that Mr. Fox was given a number (27651) upon his admission to the clinic. This number appears upon all reports.

Dr. Little testified that this number is imprinted on the X-ray films at the time such film is used in making an X-ray examination. Dr. Little further testified that he "reported X-ray films of chest and gall bladder on 10/14/44 and I examined Mr. Fox fluoroscopically and with films on 10/16/44;" that the films were actually made by technicians, but he definitely knows of his own knowledge that the films were of the insured because of the clinic number imprinted on them at the time of the examination.

In the records of the clinic introduced in evidence is an X-ray Consultation Report dated 10–16–44, bearing the name of Mr. Charles Fox, case number 27651. This report was made by Dr. Little, and the statement set out in our opinion as to the contents of this report, was but a substantial verbatim copy of the report.

Dr. Edgar W. Warren, by deposition, identified the letter of 27 October 1944, addressed to Dr. Newman, as being his work. This letter is set out in full in Judge Carr's opinion. This letter is part of the records of the clinic pertaining to the insured.

Again our statement of which counsel complains was but a verbatim copy of Dr. Warren's report to Dr. Newman, through whom the insured was referred to the clinic.

While the films themselves were no longer in the records of Ochsner Clinic, having been forwarded to Dr. Newman who turned them over to the insured, we are clear to the conclusion that statement appearing in our opinion, and which counsel contends is unsupported by evidence is fully supported by undisputed documentary evidence, and our statement is but a copy of these records.

Other matters are argued in the brief in support of appellee's application for rehearing. We believe these points to have been covered in our original opinion, and therefore refrain from again discussing them.

Application overruled.

CARR, P. J., dissents.